83 P.3d 573

PHELPS DODGE CORPORATION; Phelps Dodge Morenci, Inc.; Phelps Dodge, formerly known as Cyprus Climax Metals Corporation and formerly known as Cyprus Sierrita Corporation and formerly known as Cyprus Bagdad Copper Corporation and formerly known as Cyprus Mineral Park Corporation; Ajo Improvement Company; Morenci Water & Electric Company;

ASARCO Incorporated; Arizona Mining Association; Arizona Association of Industries and Arizonans for Electric Choice and Competition (collectively "AECC"), Intervenors–Appellants, Cross Appellees,

Residential Utility Consumer Office, Intervenor–Appellant,

The Arizona Corporation Commission, an agency of the State of Arizona, Defendant–Appellant, Cross Appellee,

v.

ARIZONA ELECTRIC POWER COOPERATIVE, INC.; Duncan Valley Electric Cooperative, Inc.; Graham County Electric Cooperative, Inc.; Sulphur Springs Valley Electric Cooperative, Inc.; and Trico Electric Cooperative, Inc., Plaintiffs–Appellees, Cross Appellants,

Arizona Consumers Council, Plaintiff–Cross Appellant.

No. 1 CA–CV 01–0068.

Court of Appeals of Arizona, Division 1, Department B.

Jan. 27, 2004.

100

Fennemore Craig, P.C., By C. Webb Crockett, Jay L. Shapiro, Karen E. Errant, Phoenix, Attorneys for Intervenors–Appellants, Cross Appellees Phelps Dodge Corporation; Phelps Dodge Morenci, Inc.; Phelps Dodge, fka Cyprus Climax Metals Corporation and fka Cyprus Sierrita Corporation and fka Cyprus Bagdad Copper Corporation and fka Cyprus Mineral Park Corporation; Ajo Improvement Company; Morenci Water & Electric Company; ASARCO Incorporated; Arizona Mining Association; Arizona Association of Industries; and Arizonans for Electric Choice and Competition.

Arizona Corporation Commission, By Janet F. Wagner, Janice M. Alward, Phoenix, Attorneys for Defendant–Appellant, Cross Appellee, Arizona Corporation Commission.

Residential Utility Consumer Office, By Scott S. Wakefield, Chief Counsel, Daniel W. Pozefsky, Phoenix, Attorneys for Intervenor–Appellant, Residential Utility Consumer Office.

Gallagher & Kennedy, P.A., By Michael M. Grant, Todd Wiley, Phoenix, Attorneys for Plaintiffs–Appellees, Cross Appellants, Arizona Electric Power Cooperative, Inc.; Duncan Valley Electric Cooperative, Inc.; and Graham County Electric Cooperative, Inc.

Waterfall, Economidis, Caldwell, Hanshaw & Villamana, PC, By Russell E. Jones, D. Michael Mandig, Tucson, Attorneys for Plaintiff–Appellee, Cross Appellant, Trico Electric Cooperative, Inc.

Hitchcock Hicks & Conlogue, By Christopher Hitchcock, Bisbee, Attorneys for Plaintiff–Appellee, Cross Appellant, Sulphur Springs Valley Electric Cooperative, Inc.

Arizona Center for Law in the Public Interest, By Tina A. Calos, Timothy M. Hogan, Phoenix, Attorneys for Plaintiff–Cross Appellant, Arizona Consumers Council.

## OPINION

TIMMER, Presiding Judge.

¶ 1 Beginning in 1994, the Arizona Corporation Commission ("Commission") began restructuring the electric industry in Arizona by shifting from a system of regulated monopolies to a competitive market for the provision of electric generation and other ser-

vices. The new structure does not affect the transmission and distribution of electric power by public service corporations that exist as monopolies subject to Commission regulation.

¶2 In these appeals and cross-appeals from consolidated cases, we are asked to resolve constitutional, statutory, and administrative challenges to the Retail Electric Competition Rules promulgated by the Commission to implement competition. We must also determine the validity of Commission decisions approving the entry of new competitive electric generators into the market. For the reasons that follow, we affirm in part, reverse in part, and remand to both the Commission and the superior court for further proceedings.

### GENERAL BACKGROUND

¶3 Electricity is created and provided to consumers in three phases: generation, transmission, and distribution. Michael Evan Stern & Margaret M. Mlynczak Stern, *A Critical Overview of the Economic and Environmental Consequences of the Deregulation of the U.S. Electric Power Industry,* 4 Envtl. Law. 79, 84 (Sept.1997). Electricity is first generated in power plants by using fuels such as coal, nuclear power, or solar power. The generated electricity is transmitted over high voltage power lines before being transformed to low voltage power and then distributed to consumers. Ashutosh Bhagwat, *Institutions and Long Term Planning: Lessons from the California Electricity Crisis,* 55 Admin. L.Rev. 95, 97–98 (2003). With some exceptions, public service corporations, operating as monopolies regulated by the Commission, traditionally provided bundled packages of generation, transmission, and distribution services to consumers within designated geographical areas.

¶4 In December 1996, the Commission created the Retail Electric Competition Rules, Arizona Administrative Code ("A.A.C.") R14–2–1601 to R14–2–1616, to change the provision of electric generation and related services, such as metering, from a system of regulated monopolies to a competitive one. *See* A.A.C. R14–2–1601(7), (30) (listing competitive and non-competitive ser-

vices). After multiple revisions, the Commission issued Decision No. 61969 in September 1999, which adopted the rules in the form challenged in the present case, A.A.C. R14–2–1601 to R14–2–1617 ("Rules"). The Commission determined that the Rules were exempt from the attorney general review and certification provisions of the Arizona Administrative Procedure Act ("APA"), Arizona Revised Statute ("A.R.S.") section 41–1044 (1999).

¶5 The Rules require an electric service provider ("ESP") desiring to offer competitive services to file an application with the Commission for issuance of a certificate of convenience and necessity ("CC & N"). A.A.C. R14–2–1603. Among other information, an ESP must submit a proposed tariff for each service that states the maximum rate applicable to the provision of that service. A.A.C. R14–2–1603(B). Upon approval of the tariff and issuance of the CC & N, the ESP could provide competitive services within a prescribed geographical area. A.R.S. § 40–281 (1996); A.A.C. R14–2–1605.

¶6 The Rules direct existing public service corporations that provide bundled services ("Affected Utilities") to allow ESPs access to transmission and distribution facilities. A.A.C. R14–2–1604, –1606(A), (C), –1609(A). Additionally, Affected Utilities must file with the Commission "unbundled" tariffs, which identify various services with associated rates, in order to allow consumers to compare rates for services. A.A.C. R14–2–1601(44), –1606(C).

¶7 With one exception, Affected Utilities cannot offer competitive services other than as part of their "standard offer" service, whereby a company provides all electric service, including generation and metering, in a bundled package and at a regulated rate. A.A.C. R14–2–1601(5), (39), –1606(A), –1615(B). Distribution cooperatives, *see infra* n. 1, can compete for generation services within their designated territories but not outside them. A.A.C. R14–2–1615(C). Consequently, Affected Utilities, other than distribution cooperatives, must divest themselves of competitive generation assets and services, although they may transfer such

assets to corporate affiliates for a fair and reasonable value. A.A.C. R14–2–1615(A), (C). A corporate affiliate may provide competitive services after applying for and obtaining a CC & N, and after the Affected Utility files with the Commission a code of conduct describing procedures in place designed to prevent anti-competitive activities. A.A.C. R14–2–1603(A), –1616.

¶ 8 The Rules also provide procedures for Affected Utilities to recover "stranded costs" that are thought to be unrecoverable in a competitive market. A.A.C. R14–2–1607. "Stranded costs" include the difference between the net original cost of assets necessary to furnish electricity, such as generating plants and fuel contracts, and the market value of such assets as affected by the introduction of competition. A.A.C. R14–2–1601(40). The Commission may authorize Affected Utilities to recover such costs over time through distribution charges or other means. A.A.C. R14–2–1607(D). An Affected Utility's territory will not be opened for competitive services until its stranded-costs case has been resolved by the Commission. A.A.C. R14–2–1602(A).

¶ 9 Ratemaking under the Rules differs for Affected Utilities and ESPs. The Commission continues to set specific rates for Affected Utilities upon a resolution of a rate case. A.A.C. R14–2–1606(C). In contrast, the Commission sets a rate ceiling for competitive ESPs by approving proposed tariffs, which set forth services and the maximum rates for those services. A.A.C. R14–2–1603(B), –1606(H). The rate ceiling does not have to correspond to any rates set for Affected Utilities. An ESP may price its services at or below the specified maximum rates, "provided that the [rates are] not less

than the marginal cost of providing the service[s]." A.A.C. R14–2–1611(E). The objective, according to the Commission, is that competitive market forces will drive rates down from rates set for Affected Utilities. The Rules declare that rates set by the market for competitive services are deemed just and reasonable. A.A.C. R14–2–1611(A).

¶ 10 Under the various versions of the Rules, the Commission granted competitive CC & Ns to fifteen ESPs within the service territories of several Affected Utilities. These Affected Utilities consist of four nonprofit rural distribution cooperatives and the generation and transmission cooperative they formed to supply power. We refer to these Affected Utilities collectively as the "Cooperatives." [1]

### FACTS PERTINENT TO CONSOLIDATED CASES

¶ 11 In February 1997, Tucson Electric Power Company, Inc. ("TEP"), an Affected Utility, filed a complaint in the superior court challenging the Commission's decision to adopt the first version of the Rules.[2] The court allowed numerous entities [3] (collectively "AECC") and the Residential Utility Consumer Office ("RUCO") to intervene in support of the Commission's position in the case. Thereafter, the Cooperatives initiated multiple lawsuits challenging the Commission's decisions adopting the Rules and predecessor versions of the Rules, and its decisions issuing CC & Ns to twelve ESPs. Finally, the Arizona Consumers Council ("Council") filed an action challenging the Commission's decision to adopt the Rules. The superior court consolidated these lawsuits.

---

1. The following utilities comprise the distribution cooperatives: Duncan Valley Electric Cooperative, Inc., Graham County Electric Cooperative, Inc., Sulphur Springs Valley Electric Cooperative, Inc., Trico Electric Cooperative, Inc. These cooperatives joined to form Arizona Electric Power Cooperative, Inc. ("AEPCO"), a generation and transmission cooperative, that transmits power to the member distribution cooperatives.

2. TEP eventually settled its dispute with the Commission and is therefore not a party to this appeal.

3. These entities are Arizonans for Electric Choice and Competition, Phelps Dodge Corporation, Phelps Dodge Morenci, Inc., Phelps Dodge formerly known as Cyprus Climax Metals Corporation and formerly known as Cyprus Sierrita Corporation and formerly known as Cyprus Bagdad Copper Corporation and formerly known as Cyprus Mineral Park Corporation, Ajo Improvement Company, Morenci Water & Electric Company, ASARCO Incorporated, Arizona Mining Association, and Arizona Association of Industries.

¶ 12 After consolidation, the Cooperatives and the Council continued their challenges to Decision No. 61969, which approved the Rules. Rather than address the Cooperatives' challenges to each disputed CC & N decision, the Commission and the Cooperatives stipulated to use Decision No. 61303, which issued a CC & N to PG & E Energy Services ("PG & E"), as an exemplar for assessing the validity of all the CC & N decisions. Finally, the parties stipulated that the cases would be resolved by dispositive motions.

¶ 13 After the parties filed motions and cross-motions for summary judgment, the court granted and denied them in part. The court accepted the Cooperatives' assertion that the Rules violated Article 15, Section 14, of the Arizona Constitution and were therefore invalid. The court also found that some of the Rules were invalid because the Commission had not submitted them to the attorney general for certification pursuant to the APA, A.R.S. § 41–1044. Because the Commission issued the disputed CC & Ns pursuant to the Rules, the court vacated the decisions approving those CC & Ns.

¶ 14 The court rejected claims by the Cooperatives and the Council that the Commission abrogated its responsibility under the constitution by effectively permitting the competitive market to set rates. The court also rejected the Cooperatives' claims that (1) the Commission lacked authority to approve rules that changed the electrical generation market from a regulated monopoly to a competitive one, (2) the CC & Ns issued to the Cooperatives by the Commission constituted bilateral contracts that granted them vested property rights to continue to provide electric power in a particular manner, (3) the stranded-costs provisions of the Rules violate Article 2, Section 17, of the Arizona Constitution, and (4) provisions in the Rules that prohibit joint marketing between Affected Utilities and competitive affiliates violate

their free commercial speech rights under the federal and state constitutions. The court further ruled that other claims asserted by the Cooperatives were not ripe for review.

¶ 15 Finally, the court ruled that the Cooperatives were the prevailing parties and therefore awarded them attorneys' fees and costs. After the ruling was reduced to a judgment, these appeals and cross-appeals followed.

## STANDARD OF REVIEW

█ ¶ 16 We review the judgment of the superior court rather than the decisions of the Commission. *Babe Inv. v. Arizona Corp. Comm'n,* 189 Ariz. 147, 150, 939 P.2d 425, 428 (App.1997). In doing so, we review the facts and reasonable inferences in the light most favorable to the party against whom the superior court granted summary judgment. *Tonto Creek Estates Homeowners Ass'n v. Arizona Corp. Comm'n,* 177 Ariz. 49, 55, 864 P.2d 1081, 1087 (App.1993). We review questions of law de novo. *Pioneer Annuity Life Ins. Co. v. Rich,* 179 Ariz. 462, 464, 880 P.2d 682, 684 (App.1994).

## DISCUSSION

### I. Constitutional requirements in rate setting

█ ¶ 17 The parties raise on appeal and cross-appeal several issues concerning the viability of the Rules and the resulting CC & Ns under Article 15, Sections 3 and 14, of the Arizona Constitution. Because these issues are interrelated, we address them together and in turn.[4]

### A. Determination and use of fair value in rate setting

¶ 18 Our constitution requires the Commission to "prescribe ... just and reasonable rates and charges to be made and collected, by public service corporations" for services

---

4. As an initial matter, we reject the Commission's argument that the Cooperatives are barred from asserting any claims in their cross-appeals because they failed to exhaust administrative remedies by seeking to either modify the schedule for implementing competition, *see* A.C.C. R14–2–1604(F)(1), or obtain an exemption from

or variation of any provision of the Rules, *see* A.C.C. R14–2–1614(C). The Cooperatives properly exhausted administrative remedies by seeking a rehearing of the challenged Commission decisions within twenty days of their entry. A.R.S. §§ 40–253(A), –254(A) (2001).

rendered in the state. Ariz. Const. art. 15, § 3.[5] To assist the Commission in the "proper discharge of its duties," the Commission must "ascertain the fair value of the property within the State of every public service corporation doing business therein." Ariz. Const. art. 15, § 14.[6] "Public service corporations" include non-municipal corporations that furnish electricity for light, fuel, or power. Ariz. Const. art. 15, § 2. The Commission has traditionally used fair value to set a utility's rate base. *Scates v. Arizona Corp. Comm'n,* 118 Ariz. 531, 534, 578 P.2d 612, 615 (App.1978). Thereafter, the Commission applies a rate of return to the rate base in order to establish just and reasonable rates. *Id.*

¶ 19 The superior court ruled that Article 15, Section 14 required the Commission to determine the fair value of property owned by ESPs seeking to provide services within Arizona, and that both the Rules and the CC & Ns issued pursuant to the Rules were invalid due to the Commission's failure to comply with that requirement. The Commission appeals this ruling. The court further decided that although the Commission was required to determine fair value, Article 15, Sections 3 and 14 did not compel the Commission to base "just and reasonable rates" on its fair-value findings. The Cooperatives cross-appeal this ruling.[7]

5. Article 15, Section 3 provides, in pertinent part, as follows:

   The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State....

6. Article 15, Section 14 provides as follows:

   The Corporation Commission shall, to aid it in the proper discharge of its duties, ascertain the fair value of the property within the State of every public service corporation doing business therein; and every public service corporation doing business within the State shall furnish to the Commission all evidence in its possession, and all assistance in its power, requested by the Commission in aid of the determination of the value of the property

¶ 20 During the pendency of this appeal, the Arizona Supreme Court issued its decision in *US West Communications, Inc. v. Arizona Corp. Comm'n,* 201 Ariz. 242, 34 P.3d 351 (2001) ("*US West II* "), which substantially resolved the parties' arguments concerning these rulings. In that case, the Commission approved CC & Ns and proposed tariffs for eleven competitive telecommunications providers without determining the fair value of their property within the state. *Id.* at 244, ¶ 4, 34 P.3d at 353. US West, which had previously enjoyed a telecommunications monopoly in Arizona and whose rates were set based on the fair value of its property in the state, challenged these decisions. *Id.* at 243–44, ¶¶ 2, 5, 34 P.3d at 352–53. As here, the Commission argued that a fair-value determination was discretionary and irrelevant in a competitive environment. *Id.* at 244–45, ¶ 9, 34 P.3d at 353–54. The court held that Article 15, Section 14, of the Arizona Constitution imposed on the Commission the affirmative duty to determine fair value and that the duty was not conditioned on market structure or subject to the Commission's discretion. *Id.* at 245, ¶ 11, 34 P.3d at 354.

¶ 21 The court then proceeded to consider what use the Commission was required to make of the fair-value finding. The court noted that, although the Arizona Constitution plainly required the Commission to ascertain

within the State of such public service corporation.

7. The Commission argues that the Cooperatives may not properly cross-appeal from this ruling because the court granted them relief under Article 15, Section 14 by invalidating the Rules and attendant CC & N decisions. The Commission contends that while the Cooperatives may raise this issue in their response briefs as alternative grounds to sustain the judgment, the cross-appeals are improper. But the Cooperatives do not challenge this ruling as an alternative means to sustain the judgment. Moreover, a cross-appeal is necessary when an appellee seeks to enlarge its rights under the judgment or lessen the rights of the appellant. ARCAP 13(b)(3); *Rail N Ranch Corp. v. Hassell,* 177 Ariz. 487, 493, 868 P.2d 1070, 1076 (App.1994). Because the Cooperatives seek to both enlarge their rights and lessen those of the Commission by seeking reversal of the superior court's ruling that the Commission need not use fair value to set rates for the ESPs, the cross-appeals are appropriate.

the fair value of the property of public service corporations in the state, only the jurisprudence of the courts required that the Commission establish rates based on the fair-value finding.[8] *Id.* at 245–46, ¶ 17, 34 P.3d at 354–55. The court considered the efficacy of this rate-of-return formula in a competitive market and concluded that "[i]n such a climate, there is no reason to rigidly link the fair value determination to the establishment of rates." *Id.* at 246, ¶ 19, 34 P.3d at 355.

¶ 22 The court did not say that fair value should play no role in rate setting in a competitive environment. Conversely, the court noted that Article 15, Section 14 directed the Commission to use fair value to aid it in discharging its duties, including setting rates, and that the Commission cannot ignore fair value in setting rates within a competitive market. *Id.* at 246, ¶ 20, 34 P.3d at 355. The court recognized that the fair-value determination may be important, in conjunction with other information, to prescribe rates that fairly treat consumers and public service corporations. *Id.* at 246, ¶ 21, 34 P.3d at 355. Thus, the court concluded that fair value should be considered in rate setting in a competitive market, although the Commission has broad discretion in determining the weight to be given that factor in any particular case. *Id.*

■ ¶ 23 In a supplemental brief filed to address the impact of *US West II*, the Commission properly concedes that under the principles enunciated in *US West II*, the superior court correctly ruled that Article 15, Section 14 requires the Commission to determine the fair value of property owned by the ESPs in Arizona and consider that finding in setting rates. The Commission argues, however, that the court erred by vacating the

decisions granting CC & Ns to the ESPs because the Commission, in fact, made fair-value determinations and considered those findings in its decisions. Referring to the PG & E proceedings, the Commission asserts that it ascertained fair value by concluding that PG & E had no property in Arizona and considered that finding in deciding that competitive pricing was an appropriate substitute for the rate-of-return method of setting rates. The Commission waived this argument by raising it for the first time in its supplemental brief.[9] *Johnson v. Hispanic Broadcasters of Tucson, Inc.*, 196 Ariz. 597, 600, ¶ 8, 2 P.3d 687, 690 (App.2000). Regardless, given that the Commission has consistently maintained that it made no effort to find fair value in approving the CC & N applications, we reject its new position.

¶ 24 We likewise reject the Commission's contention that it complied with its constitutional mandate by allowing the market to set rates for ESPs because those rates would necessarily be constrained by the rates charged by incumbent Affected Utilities, which the Commission set using fair value. Article 15, Section 14, of the Arizona Constitution requires the Commission to find the fair value of in-state property owned by "every public service corporation doing business [in the state]," including the ESPs. Because we must give unambiguous constitutional language its plain meaning and effect, we conclude that the Commission's acts in determining the fair value of Affected Utilities' Arizona property did not satisfy the constitutional requirement. *See U.S. West II*, 201 Ariz. at 245, ¶ 10, 34 P.3d at 354. For this reason, the superior court correctly ruled that the Commission violated Article 15, Section 14 in approving CC & Ns for the ESPs

---

8. In monopolistic markets, "fair value has been the factor by which a reasonable rate of return was multiplied to yield, with the addition of operating expenses, the total revenue that a corporation could earn." *US West II*, 201 Ariz. at 245, ¶ 13, 34 P.3d at 354. Although *US West II* held that this rate-of-return method for rate setting may be inappropriate in a competitive environment, it affirmed the supreme court's longstanding view that this method is properly employed in traditional, non-competitive markets. *Id.* at 246, ¶ 19, 34 P.3d at 355.

9. The Commission suggests that *US West II* altered the requirements for a fair-value finding used to set rates in a competitive market, thereby justifying its argument. The Commission does not explain the basis for its contention, and we do not discern one. The court in *US West II* distinguished the manner in which the Commission may use a fair-value finding when setting rates in a monopolistic market versus a competitive market. 201 Ariz. at 246, ¶¶ 19, 21, 34 P.3d at 355. The court did not comment on the methodology employed by the Commission to find fair value.

without first determining and considering fair value.

¶ 25 The Cooperatives contend in supplemental briefs that *US West II* supports their challenge to the superior court's ruling concerning the use of fair-value findings in setting rates for the ESPs. The superior court ruled that although the Commission must determine fair value of the ESPs' in-state property, "it is not locked into fair value in determining what is a just and reasonable rate," and "need not follow it for determining what is 'just and reasonable.'" According to the Cooperatives, this ruling effectively authorizes the Commission to ignore a fair-value determination in setting rates for the ESPs, which *US West II* expressly condemned.

¶ 26 We disagree with the Cooperatives' characterization of the superior court's ruling. The court's statements about the utility of fair-value determinations in a competitive market were made in rejecting the notion that Article 15, Section 14 rigidly requires the Commission to set rates based on those determinations. Viewed in that context, the court did not rule that the Commission could simply engage in a futile exercise of determining fair value and then completely ignore its findings. Rather, the court acknowledged that fair-value determinations must be used to aid the Commission in the proper discharge of its duties, and then gave examples of how such findings might be used in setting rates for the ESPs.[10] Based on our reading of the court's ruling, it is consistent with the pronouncement in *US West II* that the Commission should consider fair value when setting rates within a competitive market, although the Commission has broad discretion in determining the weight to be given that factor in any particular case. We do not discern error in the court's ruling on this point.

### B.  Use of market forces to set rates

■ ¶ 27 The Cooperatives and the Council argue in their cross-appeals that the superior court erred by failing to rule that the

Commission violated Article 15, Section 3, of the Arizona Constitution by permitting the competitive market to prescribe just and reasonable rates for the ESPs. Specifically, they contend that the Commission improperly abandoned its constitutional duty to prescribe just and reasonable rates by promulgating A.A.C. R14–2–1611(A), which states that "[m]arket determined rates for Competitive Services ... shall be deemed to be just and reasonable."

¶ 28 The Commission responds that it fulfilled its constitutional mandate by setting standard offer rates for the Affected Utilities that effectively serve as price caps on any rates charged by the ESPs. Because the Commission set the Affected Utilities' rates using the traditional fair-value analysis, and the ESPs will necessarily charge less than these rates to attract new customers, the Commission contends that it effectively prescribed just and reasonable rates by promulgating R14–2–1611(A).

■ ¶ 29 We must construe the challenged Rule to be constitutional if possible. *See Arizona Dep't of Revenue v. Arizona Pub. Serv. Co.*, 188 Ariz. 232, 235, 934 P.2d 796, 799 (App.1997). To successfully challenge the facial validity of a regulation, the party challenging the provision must demonstrate that no circumstances exist under which the regulation would be valid. *Reno v. Flores*, 507 U.S. 292, 301, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

¶ 30 To resolve this issue, we first examine the attributes of "just and reasonable rates," as that term is used in Article 15, Section 3. Our courts have consistently held that "just and reasonable rates" are those that are fair to both consumers and public service corporations. *See Arizona Cmty. Action Ass'n v. Arizona Corp. Comm'n*, 123 Ariz. 228, 231, 599 P.2d 184, 187 (1979). In deciding that the Commission cannot authorize a utility to increase rates based solely on a decline on the return on a utility's common stock, our supreme court explained the interests that must be considered when setting rates:

**10.** For example, the court envisioned that the Commission could use fair-value determinations to assess whether the marketplace is functioning

fairly and is free from price gouging or predatory pricing.

In determining what is a reasonable price to be charged for services by a public-service corporation, an examination must be made not only from the point of view of the corporation, but from that of the one served, also. A reasonable rate is not one ascertained solely from considering the bearing of the facts upon the profits of the corporation. The effect of the rate upon persons to whom services are rendered is as deep a concern in the fixing thereof as is the effect upon the stockholders or bondholders. A reasonable rate is one which is as fair as possible to all whose interests are involved.

*Id.* at 231, 599 P.2d at 187 (quoting *Salt River Valley Canal Co. v. Nelssen,* 10 Ariz. 9, 13, 85 P. 117, 119 (1906)) (emphasis omitted); *see also Cogent Pub. Serv., Inc. v. Arizona Corp. Comm'n,* 142 Ariz. 52, 56, 688 P.2d 698, 702 (App.1984) ("It has long been the policy of our courts to recognize that the setting of utility rates must take into account the interests of utility consumers as well as utility shareholders."). The consideration of consumer interests in setting just and reasonable rates fulfills the protective role the constitutional framers envisioned in creating the Commission and clothing it with exclusive power to set rates and regulate utilities. *See Arizona Corp. Comm'n v. State ex rel. Woods,* 171 Ariz. 286, 290, 830 P.2d 807, 811 (1992) ("The founders expected the Commission to provide both effective regulation of public service corporations and consumer protection against overreaching by those corporations."); *State v. Tucson Gas, Elec. Light & Power Co.,* 15 Ariz. 294, 306–08, 138 P. 781, 786 (1914) (holding Commission created and given full power to investigate, hear, and determine disputes between utility and general public "primarily for the interest of the consumer").

¶ 31 Bearing in mind the Commission's duty to consider the interests of "all whose interests are involved" in setting just and reasonable rates, we now decide whether the Commission can fulfill its constitutional mandate if "market determined rates" alone are deemed "just and reasonable" as prescribed by A.A.C. R14–2–1611(A). We agree with the Cooperatives and the Council that this rule prevents the Commission from fully performing its duties and therefore violates Article 15, Section 3.

¶ 32 Article 15, Section 3 not only empowers the Commission to set just and reasonable rates, it requires the Commission to do so. No other branch of government can perform this function. *Woods,* 171 Ariz. at 292, 830 P.2d at 813 (characterizing the Commission's ratemaking power as "exclusive"). Therefore, although the Commission may be influenced by market forces in determining what rates are "just and reasonable," the Commission may not abdicate its constitutional responsibility to set just and reasonable rates by allowing competitive market forces alone to do so.

¶ 33 We reject the Commission's contention that its approval of a broad range of rates within which the competitive marketplace can operate satisfies the Commission's obligation to set just and reasonable rates because standard offer rates will necessarily serve as a rate cap. The Commission assumes that consumers will choose an ESP only if it offers a lower rate than an Affected Utility, thereby forcing ESPs to charge just and reasonable rates. As the Council points out, however, the decision to switch to and then stay with an ESP may turn on other factors, such as reliability of service, notwithstanding the higher rate charged by an ESP.

¶ 34 Additionally, even assuming a customer chooses an ESP due to its lower rates, once the ESP is established in the market, it may increase its rates within the approved range without regard to consumer fairness or a fair return, possibly banking on some consumers' natural reluctance to constantly monitor rates, discover abuses, and then switch services.[11] The constitution charges the Commission, not consumers themselves, with the duty to discover and remedy such potential overreaching by public service corporations. *Woods,* 171 Ariz. at 295, 830 P.2d at 816; *see also Farmers Union Cent. Exch.*

11. The Commission appears to acknowledge the feasibility of this scenario by acknowledging that "the regulatory structure devised by [it] creates a market in which, *at least for the transition period,* a new competitor cannot charge rates higher than the incumbent's." (Emphasis added).

*v. F.E.R.C.*, 734 F.2d 1486, 1510 (D.C.Cir. 1984) (criticizing similar method for setting "just and reasonable" oil pipeline rates because "[s]uch an approach retains the false illusion that a government agency is keeping watch over rates, pursuant to the statute's mandate, when it is in fact doing no such thing") (citation omitted). R14–2–1611(A) is inconsistent with that charge.

¶ 35 The potential for overreaching is exemplified by the Commission's approval of a wide range of rates that PG & E may charge consumers. In accordance with the Rules, the Commission authorized PG & E to charge consumers a negotiated, market-based rate that is not less than PG & E's marginal cost nor greater than $25 per kilowatt hour. The Commission did not ascertain PG & E's marginal cost. Additionally, at the time the Commission set the maximum rate, the average price of electricity was 3 cents to 5 cents per kilowatt hour. Thus, any rate PG & E can negotiate between its unknown marginal cost and a rate that is roughly 500 to 830 times the average price of electricity, regardless of fairness to the consumer, its impact on an Affected Utility, or whether the rate provides a fair return, is deemed "just and reasonable" pursuant to R14–2–1611(A). The potential for abuse in pricing within this virtually unrestricted range of rates is apparent and can only be avoided by having the Commission, rather than the market alone, set just and reasonable rates. *Cf. Arizona Cmty. Action Ass'n*, 123 Ariz. at 231, 599 P.2d at 187 (holding Commission cannot authorize utility to increase rates based solely on return on stock and warning of "potential danger of tying rates to one factor over which [the utility] exercises total control ... without regard for the interests of the consumer").

¶ 36 Additionally, for all intents and purposes, R14–2–1611(A) prevents the Commission from granting consumers relief from any market-determined rates challenged as excessive. *See Woods*, 171 Ariz. at 291, 830 P.2d at 812 (describing Commission's function in "adjudicating grievances"). As the Council notes, because market-determined rates are deemed just and reasonable, consumers would be unable to successfully contend otherwise. In effect, the market, rather than the Commission, would serve to adjudicate claims of excessive rates.

¶ 37 By exclusively allowing the market to set the ESPs' rates, the Commission also abdicates its responsibility to ensure that such rates are fair to the ESPs. *See Arizona Cmty. Action Ass'n*, 123 Ariz. at 231, 599 P.2d at 187. An ESP may set its rates low in order to attract customers, possibly denying itself a fair return and causing it to cut costs or raise charges elsewhere to compensate. Such measures could potentially affect service to the detriment of the consuming public.

¶ 38 Finally, by deeming market-determined rates alone just and reasonable, the Commission effectively abandons utilization of the fair-value finding that is required by Article 15, Section 14 in setting such rates. *See supra* ¶¶ 25–26.

¶ 39 For all these reasons, we hold that A.A.C. R14–2–1611(A) violates Article 15, Section 3, of the Arizona Constitution by improperly delegating to the competitive marketplace the Commission's duty to set just and reasonable rates that provide for the needs of all whose interests are involved, including public service corporations and the consuming public. The rule also violates Article 15, Section 14 by establishing a method for setting just and reasonable rates that does not include consideration of fair value of property owned by ESPs in Arizona. Because R14–2–1611(A) cannot be validly applied under any set of circumstances, it is unconstitutional on its face. *Reno*, 507 U.S. at 301, 113 S.Ct. 1439.

## C. Establishing a range of permissible rates

¶ 40 The Cooperatives argue that the superior court also erred by failing to invalidate R14–2–1611(A) because it conflicts with the Commission's duty to prescribe a single rate rather than a range of rates. Because this argument is likely to recur on remand to the Commission, we address it. *Webb v. State ex rel. Arizona Bd. of Med. Exam'rs*, 202 Ariz. 555, 560, ¶ 18, 48 P.3d 505, 510 (App.2002).

¶ 41 The Cooperatives contend that in a competitive market, the Commission must prescribe an ESP's rate, but that the ESP may streamline its operations to charge less than this rate in order to compete. They further contend that the court erred by failing to invalidate A.A.C. R14–2–1604(A)(2), (4), and R14–2–1611(E), which permit ESPs to negotiate with individual customers or aggregations of customers to set rates within a range established by the Commission. All of these assertions are based on the Cooperatives' view that Article 15, Section 3, of the Arizona Constitution requires the Commission to prescribe a single rate rather than a range of rates.

¶ 42 Article 15, Section 3 requires the Commission to "prescribe just and reasonable ... rates and charges." In interpreting this provision, our primary focus is on the intent of the framers, *Indus. Dev. Auth. of the County of Pima v. Maricopa County*, 189 Ariz. 558, 560, 944 P.2d 73, 75 (App.1997), and we do not go outside the plain language of the provision unless the language is unclear. *State v. Superior Court (Topf)*, 186 Ariz. 363, 365, 922 P.2d 927, 929 (App.1996).

¶ 43 The Cooperatives point out that the constitutional framers rejected proposals that would either empower or obligate the Commission to set maximum rates for public service corporations. *Records of the Arizona Constitutional Convention of 1910*, at 1159–60, 1271–72 (John S. Goff ed., 1991). According to the Cooperatives, the rejected proposals evidence the framers' intent that the Commission set a single rate. But rejection of these proposals could equally evidence an intent that the Commission refrain from merely setting a rate ceiling in order to both ensure that rates provide a fair return to public service corporations and to avoid predatory pricing practices.[12] Or perhaps the framers simply intended to grant the Commission more flexibility in setting just and reasonable rates by employing the broader language ultimately adopted in Article 15, Section 3. Because the framers' rejection of · the proposals gives rise to more than one

meaning, all of which are speculative, we reject the Cooperatives' contention.

¶ 44 Nothing in the plain language of Article 15, Section 3 requires the Commission to prescribe a single rate rather than a range of rates. Moreover, our supreme court has held that the Commission has discretion to adopt various approaches to fulfill its functions, "as long as the method complies with the constitutional mandate and is not arbitrary and unreasonable." *Arizona Corp. Comm'n v. Arizona Pub. Serv. Co.*, 113 Ariz. 368, 371, 555 P.2d 326, 329 (1976). Consequently, assuming the Commission establishes a range of rates that is "just and reasonable," the Commission does not violate Article 15, Section 3 by permitting competitive market forces to set specific rates within that approved range.

### D. Facial validity of Rules

¶ 45 The court vacated the Rules, the predecessor versions of the Rules, and the decisions approving them, because the Rules do not require the Commission to ascertain and consider fair value of the ESPs' Arizona property, as required by Article 15, Section 14. The Commission, RUCO, and AECC argue that the court erred in this ruling because the Rules themselves do not set the rates, nothing in them precludes the Commission from ascertaining and considering fair value in setting rates, and the Rules are otherwise consistent with the Commission's constitutional mandate to ascertain fair value. The Cooperatives and the Council counter that the Rules are facially unconstitutional because they make no provision for finding fair value and R14–2–1611(A) is inconsistent with the constitutional requirement to determine and consider this factor in setting rates.

¶ 46 The Rules are unconstitutional on their face if they cannot be applied under any circumstances without violating Article 15, Sections 3 and 14. *Reno*, 507 U.S. at 301, 113 S.Ct. 1439. Otherwise, their constitu-

---

12. A company engages in "predatory pricing" by charging a low rate designed to drive competition from the market. When that result is achieved, the company has monopoly control of

the market and can then recoup its earlier losses by increasing its rates. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 589–90, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

tionality can only be attacked as applied in particular circumstances. *Williams v. Pryor*, 240 F.3d 944, 953 (11th Cir.2001).

¶ 47 As previously explained, *see supra* ¶¶ 27–39, R14–2–1611(A) is unconstitutional on its face as it prevents the Commission from fulfilling the duties mandated by Article 15, Sections 3 and 14. The remaining Rules, however, can be applied in a manner consistent with the constitution. Although no rule specifically requires the Commission to determine and consider fair value, that omission does not invalidate the Rules in their entirety, as the superior court ruled. Article 15, Section 14 is self-executing as it affirmatively requires the Commission to determine fair value in setting rates, and a rule is therefore not needed to impose this requirement. *See Arizona Pub. Serv. Co. v. Arizona Corp. Comm'n*, 157 Ariz. 532, 536, 760 P.2d 532, 536 (1988) (holding Article 15, Section 13 self-executing because further legislation unnecessary to give Commission power specifically granted by this provision); *see also Miller v. Wilson*, 59 Ariz. 403, 408, 129 P.2d 668, 670 (1942) (holding constitutional provision self-executing if it grants right that can be put into operation without further legislative action). Moreover, the Rules empower the Commission to gather sufficient information to make the fair-value determination by requiring ESPs to provide documentation of "other pertinent financial information," A.A.C. R14–2–1603(B)(5), and "[s]uch other information as the Commission or the staff may request" in support of an application for a CC & N, A.A.C. R14–2–1603(B)(8). Because the Rules, other than R14–2–1611(A), are not inconsistent with nor restrictive of the Commission's constitutional mandate to determine and consider fair value in rate setting, the Rules are not unconstitutional on their face.

¶ 48 The remaining issue before us is whether R14–2–1611(A) can be severed from the Rules, leaving the remaining rules intact, or whether all the Rules must be invalidated.

AECC contends that the rule can be severed, leaving the valid portion of the Rules intact.[13] The Cooperatives assert that the constitutional defect represented by R14–2–1611(A) cannot be cured by severing the provision because it is the "heart and soul" of the Rules. Similarly, the Council argues that the Rules must rise or fall as a single regulatory scheme.

¶ 49 Our courts have repeatedly held that if part of a legislative act is unconstitutional, it alone should be severed if the balance of the act remains workable. *Randolph v. Groscost*, 195 Ariz. 423, 427, ¶ 13, 989 P.2d 751, 755 (1999); *Long v. Napolitano*, 203 Ariz. 247, 266, ¶ 70, 53 P.3d 172, 191 (App. 2002). The Rules have "the same effect and force as a law." *Goodman v. Superior Court*, 136 Ariz. 201, 203, 665 P.2d 83, 85 (1983). Consequently, no reason appears, and neither the Cooperatives nor the Council suggest any, why we cannot similarly sever R14–2–1611(A) from the Rules if the remaining regulatory framework is workable. *See Burbridge v. Sampson*, 74 F.Supp.2d 940, 954 (C.D.Cal.1999) (holding board's unconstitutional regulations severable from remainder).

¶ 50 We will sever R14–2–1611(A) and leave the remaining Rules intact if (1) the remainder is independent of R14–2–1611(A) and is enforceable standing alone, and (2) the remainder is not so intimately connected with R14–2–1611(A) as to raise the presumption that the Commission would not have enacted the former without the latter, and R14–2–1611(A) did not induce the Commission to approve the Rules. *Randolph*, 195 Ariz. at 427, ¶ 14, 989 P.2d at 755. We have no difficulty concluding that the Rules are independent of R14–2–1611(A) and are enforceable standing alone. First, as AECC contends, the Rules establish a framework for retail electric competition that involves more than ratemaking. *See, e.g.*, A.A.C. R14–2–1604 (competitive phases), –1612 (service quality), –1613 (reporting requirements), –

---

**13.** AECC also contends that A.A.C. R14–2–1603(B)(3) and –1611(B) can be severed from the Rules, if necessary. These rules require an ESP to file a tariff stating the maximum rate for each provided service. Because the Commission may establish a range of rates in setting just and reasonable rates, *see supra* ¶¶ 40–44, the Commission can validly consider an ESP's proposed maximum rate. Consequently, these rules are not inconsistent with the Commission's constitutional duties.

1616 (code of conduct). These provisions will be unaffected by severing R14–2–1611(A). Second, as previously explained, *see supra* ¶ 47, R14–2–1611(A) is not necessary to empower or enable the Commission to set just and reasonable rates after determining fair value of the ESPs' Arizona property.

¶ 51 The record additionally reveals that the Commission would have approved the remainder of the Rules if market rates could not be deemed "just and reasonable," as provided in R14–2–1611(A), and this feature of competition did not lead to the creation of the Rules. In a 1996 decision approving the prior version of the Rules, the Commission concluded, based on a two-year period of study and public comment, that competition in the electric field was both needed and inevitable. Comm'n Dec. Order 59943 at 2. The Commission intended the Rules to provide a framework for that competition and to "streamline the regulatory process for setting rates for competitive electric services." *Id.* at 3. Although deeming market rates "just and reasonable" was likely a significant facet of the streamlining process, nothing in the Commission's decisions suggests that competition would not have been implemented if this feature were removed from the Rules. Indeed, the Commission's reference to the need for and inevitability of competition leads to the opposite conclusion. *See also* A.R.S. § 40–202(B) (2001) ("It is the public policy of this state that a competitive market shall exist in the sale of electric generation service.").

¶ 52 In summary, we hold that the superior court erred by declaring that the Rules violate Article 15, Section 14 on their face for failing to require the Commission to determine and consider fair value in setting rates for ESPs. Additionally, although R14–2–1611(A) is invalid under our constitution, the remaining Rules are workable and can therefore continue to exist intact.

## II. Promulgation of the Rules

### A. Commission authority

¶ 53 The Cooperatives argue in their cross-appeals that the superior court erred by failing to find that the Commission exceeded its authority by promulgating rules that require Affected Utilities to employ specific tactics in providing nondiscriminatory, open access to transmission and distribution facilities, A.A.C. R14–2–1609(C)–(J), divest themselves of competitive assets and services, R14–2–1615(A), (C), and develop anti-competitive codes of conduct, R14–2–1616. The Cooperatives assert that the authority to implement competition rests entirely with the legislature, the Commission can only enact rules to govern competition as authorized by the legislature, and the Commission exceeded that authority by promulgating the contested rules. The Commission and AECC counter that the Commission's constitutionally bestowed ratemaking authority empowered it to promulgate the rules or, alternatively, the legislature delegated the authority by enacting and then amending A.R.S. § 40–202.

¶ 54 The Commission does not possess any inherent powers, *Williams v. Pipe Trades Indus. Program,* 100 Ariz. 14, 17, 409 P.2d 720, 722 (1966), but instead exclusively derives its power from the constitution and the legislature. *US West Communications, Inc. v. Arizona Corp. Comm'n,* 197 Ariz. 16, 23, ¶ 29, 3 P.3d 936, 943 (App. 1999) ("*US West I*"). The Commission's ratemaking authority granted by Article 15, Section 3, of the Arizona Constitution extends beyond setting rates to include the promulgation of rules and regulations that are "reasonably necessary steps in ratemaking." *Woods,* 171 Ariz. at 294, 830 P.2d at 815. The legislature retains power to govern public service corporations in matters unrelated to this ratemaking authority. *Corp. Comm'n v. Pac. Greyhound Lines,* 54 Ariz. 159, 176–77, 94 P.2d 443, 450 (1939). However, the legislature can delegate authority to the Commission, thereby enlarging the Commission's powers and duties. Ariz. Const. art. 15, § 6.

¶ 55 The Cooperatives argue that the Commission's plenary ratemaking authority did not empower it to promulgate the contested rules because only the legislature possesses authority to implement competition, as evidenced by the 1998 amendment to A.R.S. § 40–202. The legislature amended § 40–

202 to provide that competition for electric generation services is the public policy of the state. 1998 Ariz. Sess. Laws, ch 209, § 23. Thus, the legislature required public power entities,[14] which are not subject to the Commission's jurisdiction, to open their service territories to competition in the sale of electric generation services, and "confirmed" the authority of the Commission to similarly open the service territories of public service corporations. We reject the Cooperatives' contention.

¶ 56 Article 15, Section 3 directs the Commission to prescribe just and reasonable rates for services without regard to market structure. Thus, even assuming the legislature is exclusively empowered to implement competition,[15] if the contested rules are reasonably necessary steps in ratemaking within the competitive market, the Commission possesses plenary authority to enact them. *Woods,* 171 Ariz. at 294, 830 P.2d at 815; *see also U.S. West I,* 197 Ariz. at 24, ¶ 30, 3 P.3d at 944 (holding some competitive rules clearly related to ratemaking power and thus within Commission's constitutional authority to promulgate). If not, the Commission was only authorized to promulgate the rules if the legislature delegated such authority. With these principles in mind, we address each challenged provision in turn.

### A.A.C. R14–2–1609(C)–(J)

■ ¶ 57 R14–2–1609(A), which is not challenged by the Cooperatives, states that Affected Utilities must provide nondiscriminatory open access to transmission and distribution facilities. Subsections (C)-(J), which the Cooperatives challenge, direct Affected Utilities to each create an independent scheduling administrator and a scheduling coordinator to oversee fair access to transmission services in a manner substantially prescribed by the Commission. We agree with the Cooperatives that these provisions

are not reasonably necessary steps to ratemaking. Rather, these provisions are akin to those we found outside the Commission's ratemaking authority in *US West I,* 197 Ariz. at 24, ¶ 36, 3 P.3d at 945 (deciding rules requiring local exchange carriers to provide equal access for customers to choose long-distance services and to enter interconnection arrangements with other telecommunications companies outside Commission's plenary authority). Consequently, the Commission was not empowered by Article 15, Section 3 to promulgate R14–2–1609(C)–(J).

¶ 58 We reject the Commission's alternative argument that the legislature authorized the promulgation of R14–2–1609(C)–(J) by granting the Commission broad power under A.R.S. § 40–202(A). That section, which existed prior to the 1998 amendment concerning competition, provides that "[t]he commission may supervise and regulate every public service corporation in the state and do all things, whether specifically designated in this title or in addition thereto, necessary and convenient in the exercise of that power and jurisdiction." A.R.S. § 40–202(A). The Arizona Supreme Court has interpreted this section, however, as bestowing no power on the Commission beyond that already provided by the constitution or specifically granted otherwise by the legislature. *Southern Pac. Co. v. Arizona Corp. Comm'n,* 98 Ariz. 339, 348, 404 P.2d 692, 698 (1965). Thus, § 40–202(A) did not, standing alone, authorize the Commission to promulgate R14–2–1609(C)–(J).

¶ 59 Finally, AECC argues that the legislature authorized the issuance of R14–2–1609(C)–(J) by amending A.R.S. § 40–202 to address competition. Section 40–202 authorized the Commission to promulgate R14–2–1609(C)–(J) if such authority "may be reasonably implied from the statutory scheme so as to carry out the purpose and intent of the legislative mandate." *Ethridge v. Arizona State Bd. of Nursing,* 165 Ariz. 97, 105, 796

---

**14.** A "public power entity" is, with exception, a municipal corporation, city, town or other political subdivision that generates, transmits, distributes or otherwise supplies electricity. A.R.S. § 30–801(16) (2002).

**15.** *But see Woods,* 171 Ariz. at 291, 830 P.2d at 812 (noting Article 15, Section 3 "designed to

promote both democratic control and competitive economic forces"); *US West I,* 197 Ariz. at 25, ¶ 35, 3 P.3d at 945 ("[W]e agree that the Commission has the exclusive power to determine classifications, such as competitive services, . . . .").

P.2d 899, 907 (App.1989). However, we will not infer the grant of authority to interfere with the Affected Utilities' management decisions beyond the "clear letter of the statute." *Southern Pac. Co.*, 98 Ariz. at 343, 404 P.2d at 695.

¶ 60 Neither the Commission nor AECC contests that R14–2–1609(C)–(J) invades the Affected Utilities' managerial prerogative to decide how best to open access to transmission and distribution facilities. Thus, we look to the "clear letter" of § 40–202 to discern whether the legislature authorized the Commission to promulgate R14–2–1609(C)–(J). Although AECC contends that this authority emanates from the broad provisions of § 40–202, it does not point to any specific provision granting this authority, and we do not discern one. Additionally, as the Cooperatives note, the legislature directed public service corporations to open access to transmission and distribution services in A.R.S. § 40–332(B). Thus, if the legislature intended to authorize the Commission to orchestrate implementation of the directive, we would expect to see the authority conveyed in that provision, which is silent on the point. For these reasons, we conclude that A.R.S. § 40–202 did not authorize the Commission to issue R14–2–1609(C)–(J).

¶ 61 In sum, we hold that the Commission lacked constitutional or legislative authority to promulgate R14–2–1609(C)–(J). The superior court therefore erred by failing to enter judgment for the Cooperatives on this issue. In light of our decision, we do not address the Cooperatives' additional bases for challenging the Commission's authority to issue R14–2–1609(C)–(J).

### *A.A.C. R14–2–1615(A), (C)*

¶ 62 R14–2–1615(A) requires Affected Utilities to divest themselves of competitive generation assets and competitive services by a stated date and transfer them to an unaffiliated party or a separate corporate affiliate. If the assets are transferred to an affiliate, the assets must be sold for a fair and reasonable value, as determined by the Commission. A.A.C. R14–2–1615(A). Subsection (C) of the rule exempts electric distribution cooperatives from these requirements if they do not offer competitive services outside their service territories.

¶ 63 The Cooperatives do not contest the Commission's power to promulgate R14–2–1615(B), which prohibits Affected Utilities from providing competitive services. The Cooperatives argue, however, that the Commission overstepped its authority by requiring divestiture of competitive assets, as provided by subsections (A) and (C).

¶ 64 The Commission and AECC respond that the Commission is authorized to promulgate these provisions by its plenary ratemaking power. They rely substantially on *Woods,* in which our supreme court addressed whether the Commission possessed plenary authority to govern various transactions between public service corporations and their corporate affiliates. 171 Ariz. at 287, 830 P.2d at 808. After reviewing the historical roots of the Commission's power and duties, the court concluded that the Commission was established to "protect our citizens from the results of speculation, mismanagement, and abuse of power." *Id.* at 296, 830 P.2d at 817. To accomplish these objectives, the court held that the Commission necessarily possessed the power to obtain information and take action to prevent these consequences. *Id.* "To put it simply, the Commission was given the power to lock the barn door before the horse escapes." *Id.* at 297, 830 P.2d at 818. Although the line separating permissible Commission acts and unauthorized managerial interference can be difficult to precisely discern, our supreme court has suggested that the line is drawn between rules that attempt to control rates, which are permissible, and rules that attempt to control the corporation, which are impermissible. *Id.*

¶ 65 The Commission and AECC contend that the contested rules are necessary steps in ratemaking because they are designed to prevent cross-subsidization of affiliates by Affected Utilities, which would give the affiliates a competitive edge and negatively affect rates. Giving deference to the Commission's view about what is necessary for effective ratemaking in a competitive market, *id.* at 294, 830 P.2d at 815, we conclude that the Commission can permissibly require an Af-

fected Utility that chooses to transfer competitive assets to an affiliate to do so at a fair and reasonable price, as determined by the Commission. If such assets were transferred for an unfair price, the affiliate could gain an unfair advantage in the competitive market by being able to charge rates that are not needed to cover the cost of the assets. Thus, such a provision is aimed at controlling rates rather than controlling the Affected Utilities and is therefore permissible. *Id.* at 297, 830 P.2d at 818; *cf. US West I,* 197 Ariz. at 24, ¶ 31, 3 P.3d at 944 (holding rule requiring companies to seek Commission approval to discontinue or abandon competitive services implicates ratemaking because the decision can affect profit and loss, which affects rates).

¶ 66 However, we fail to understand, and neither the Commission nor AECC attempts to explain, how requiring divestiture of competitive generation assets affects rates. If the Affected Utilities choose to retain competitive assets for a period beyond the prescribed date, or indefinitely, the competitive market is seemingly unaffected, as long as the Affected Utilities abide by R14–2–1615(B), which prohibits them from competing. Consequently, R14–2–1615(A) and (C) are aimed at controlling the Affected Utilities rather than rates and are therefore outside the Commission's plenary ratemaking authority.

¶ 67 The Commission additionally asserts, as it did in defending its authority to promulgate R14–2–1609 (C)-(J), that A.R.S. § 40–202(A) authorized issuance of R14–2–1615(A) and (C). For the reason previously explained, *see supra* ¶ 58, we reject this contention.

¶ 68 Finally, AECC argues that the legislature authorized the Commission to issue R14–2–1615(A) and (C) by amending A.R.S. § 40–202 to provide a framework for rules that left details to the Commission's discretion. AECC does not identify any particular provisions granting such authority, and we do not discern any. Section 40–202(C)(1) confirms the Commission's authority to "[p]rotect the public against deceptive, unfair and abusive business practices." But as previously stated, while prohibiting Affected Utilities from either competing or subsidizing their affiliates in competition may protect the public from these consequences, requiring divestiture of competitive generation assets does not seemingly accomplish this goal. For this reason, we conclude that § 40–202(C)(1) did not authorize the Commission to promulgate R14–2–1615(A) and (C).

¶ 69 In summary, we hold that the Commission lacked constitutional or legislative authority to promulgate R14–2–1615(A) and (C). The superior court therefore erred by refusing to enter judgment for the Cooperatives on this issue. In light of our decision, we do not address the Cooperatives' contention that the Commission lacked evidentiary support to issue R14–2–1615(A) and (C).

### A.A.C. R14–2–1616

¶ 70 R14–2–1616 requires Affected Utilities that plan to offer competitive service through affiliates to propose and file codes of conduct with the Commission for approval. These codes must describe procedures in place to prevent cross-subsidization between Affected Utilities and their competitive affiliates in areas such as information access, bookkeeping, marketing and joint employment of personnel. The Cooperatives contend that the Commission lacked the constitutional or legislative authority to issue this rule. We disagree.

¶ 71 For the same reasons the Commission has plenary power to require that any transfer of competitive assets from an Affected Utility to a competitive affiliate be for a just and reasonable price, *see supra* ¶ 65, the Commission possesses plenary power to require a code of conduct designed to prevent cross-subsidization. This requirement is aimed at controlling rates rather than the corporation. *Woods,* 171 Ariz. at 297, 830 P.2d at 818.

¶ 72 Additionally, at the time the legislature amended A.R.S. § 40–202 in 1998, it also required public power entities to file a code of conduct to prevent anti-competitive activities that may result from the joint provision of competitive and noncompetitive services. A.R.S. § 30–803(F) (Supp.1998). We agree with the Commission that the failure of the

legislature to enact a similar provision for the Affected Utilities evidences the legislature's view that requiring such a code falls within the Commission's plenary ratemaking authority.

¶ 73 We also reject the Cooperatives' contention that R14–2–1616(B)(6), which requires the code of conduct to describe "[a]ppropriate policies to eliminate joint advertising, joint marketing, or joint sales" between an Affected Utility and its competitive affiliate, impermissibly conflicts with A.R.S. §§ 10–2057(A)(4) and –2127(A)(5) (Supp.2003), which allow electric utility cooperatives to jointly market their services. Assuming these provisions conflict, the Commission's plenary ratemaking authority to promulgate R14–2–1616(B)(6) is unaffected by the legislative enactments. *Qwest Corp. v. Kelly*, 204 Ariz. 25, 30, ¶ 12, 59 P.3d 789, 794 (App.2002) (concluding Commission has exclusive ratemaking power that cannot be interfered with by other branches of government).

¶ 74 Finally, we reject the Cooperatives' contention that the Commission lacked authority to issue R14–2–1616 without first conducting an evidentiary hearing to determine that the Affected Utilities would abuse any market power they possess. The APA does not require the Commission to conduct any evidentiary hearings before promulgating the rules. A.R.S. § 41–1001, et seq.

¶ 75 The Cooperatives cite *Arizona Corp. Comm'n v. Citizens Utilities Co.*, 120 Ariz. 184, 584 P.2d 1175 (App.1978), for the principle that Commission decisions "must be supported by substantial evidence not speculation." But, as the Commission notes, *Citizens Utilities* involved a rate case rather than the promulgation of rules and is therefore inapplicable. 120 Ariz. at 186, 584 P.2d at 1177. The Cooperatives, as the parties challenging R14–2–1616, bear the burden of proving by clear and convincing evidence

that the Commission's adoption of this provision was unreasonable. A.R.S. § 40–254.01(E) (2001). The Cooperatives have not made such a showing.

¶ 76 For the foregoing reasons, we conclude that the Commission promulgated R14–2–1616 pursuant to its plenary ratemaking authority. Further, the Cooperatives did not satisfy their burden to prove that the provision was unreasonable. Therefore, the superior court did not err by entering judgment against the Cooperatives on this issue.

**B.  Attorney General certification**

¶ 77 The superior court invalidated several rules [16] for lack of attorney general certification, as provided by the APA. The Commission and RUCO contend that the court erred by (1) conducting a review of individual rules rather than considering the Rules as a comprehensive regulatory scheme, and (2) failing to conclude that all Rules are exempt from attorney general review. AECC joins in the second argument.

¶ 78 Rules promulgated by the Commission are generally subject to review and certification by the attorney general before they become effective. *See* A.R.S. § 41–1044(B).[17] Because the constitution vests exclusive authority in the Commission to prescribe just and reasonable rates and charges for public service corporations, however, Commission rules promulgated pursuant to this ratemaking authority need not be submitted to the attorney general for certification in order to be effective. *State ex rel. Corbin v. Arizona Corp. Comm'n*, 174 Ariz. 216, 219, 848 P.2d 301, 304 (App.1992).

¶ 79 The Commission and RUCO argue that the superior court erred by invalidating the contested rules for lack of attorney general certification after considering each rule separately rather than as part of a comprehensive regulatory scheme. They rely on *Woods*, in which the Arizona Supreme Court

---

16. The court invalidated A.A.C. R14–2–1602, –1603, –1605, –1609, –1610, –1612, –1613, –1614, –1615, –1616, –1617. In light of our decision that the Commission lacked authority to promulgate R14–2–1609(C)–(J) and R14–2–1615(A) and (C), we do not address the propriety of the court's ruling regarding those provisions.

17. Under § 41–1044(B), the attorney general reviews the rules to ensure they are in a proper form, are clear, concise, and understandable, within the Commission's power to enact, and were made in compliance with appropriate procedures.

decided whether the attorney general had correctly found that the Commission lacked authority to promulgate rules requiring public service corporations to seek approval of certain transactions between the corporations and their affiliates and report on that subject. 171 Ariz: at 287, 830 P.2d at 808. In concluding that the Commission possessed power to adopt the proposed rules, the court considered them as "an entire regulatory scheme" rather than separately. *Id.* at 294, 297, 830 P.2d at 815, 818.

¶ 80 Seven years after *Woods*, in *US West I*, this court decided whether the Commission had lawfully bypassed the attorney general certification process when adopting rules for competition in the telecommunications market. 197 Ariz. at 22, ¶ 25, 3 P.3d at 942. In that case, the court considered the rules individually, concluding that some were subject to attorney general review and others were not. *Id.* at 24–25, ¶¶ 30–37, 3 P.3d at 944–45. Significantly, we stated that "[t]he Commission may not insulate from review rules that are otherwise subject to attorney general review merely by enacting them with rules relating to its plenary powers." *Id.* at 25, ¶ 37, 3 P.3d at 945.

¶ 81 According to the Commission and RUCO, the methodology employed by this court in *US West I*, which the superior court followed, conflicts with the supreme court's directive in *Woods* to review Commission rules as a package in deciding the necessity for attorney general certification. We disagree.

¶ 82 First, the court in *Woods* did not consider whether the proposed rules in that case were subject to attorney general certification. Unlike the case in *US West I* and here, the Commission in *Woods* had submitted its proposed rules to the attorney general for certification, which was refused because the attorney general alleged the Commission lacked power to promulgate the rules. *Woods*, 171 Ariz. at 287, 830 P.2d at 808. Thus, *Woods* does not prescribe how courts should view Commission rules when deciding whether they are subject to attorney general review and certification.

¶ 83 Second, and more importantly, nothing in *Woods* indicates that the court intended to establish a singular method for determining whether the Commission possessed authority to promulgate particular rules. The court refused the Commission's request to separately consider the reporting requirements established by the proposed rules in *Woods* because they were closely connected to the approval provisions. *Id.* at 294, 830 P.2d at 815 ("Indeed, the reporting requirements might be useless without the approval provisions. We therefore determine the validity of the reporting requirements along with the approval provisions of the Proposed Rules as an entire regulatory scheme."). The court did not suggest that individual rules within a regulatory scheme should never be evaluated on a stand-alone basis, as the Commission and RUCO suggest.

¶ 84 For these reasons, we conclude that *US West I* is not inconsistent with *Woods*. Therefore, the superior court did not err by invalidating particular provisions within the Rules rather than determining whether the Rules as a single scheme were subject to attorney general review and certification.

¶ 85 The Commission and RUCO next argue that the superior court erred by ruling that eleven provisions within the Rules are subject to attorney general review and certification. AECC concedes that most of the contested rules are subject to attorney general review and certification, but contends the court erred by finding that four rules, A.A.C. R14–2–1602, –1610, –1615, –1616, are similarly restricted.

¶ 86 In *US West I*, we held that the Commission's rules (1) requiring CC & Ns and setting conditions for their issuance, (2) compelling local exchange carriers to provide interconnection arrangements with other carriers and give equal access to customers to choose long-distance services, (3) setting quality service standards, (4) setting forth administrative requirements, and (5) discussing billing and collection practices, did not implicate the Commission's plenary ratemaking power and were therefore subject to attorney general review and certification. 197 Ariz. at 24–25, ¶¶ 32–33, 36, 3 P.3d at 944–45. Similarly, the provisions within the Rules

that concern these same topics [18] are subject to attorney general review, and the superior court did not err in so ruling.

¶ 87 R14–2–1602 provides that an Affected Utility's customers will be eligible to select competitive services on the date established in the Affected Utility's stranded-cost proceeding. *See supra* ¶ 8. Affected Utilities may recover stranded costs over time by collecting charges from customers. A.A.C. R14–2–1607. Because the rates for services are affected by the commencement of competition, the rule is reasonably related to setting rates and is not subject to attorney general review and certification. The superior court therefore erred by vacating the rule on this basis.

¶ 88 R14–2–1610 concerns procedures for opening service territories of electric utilities that are not Affected Utilities or public power entities if such electric utilities voluntarily choose to open their territories. AECC argues generally that because competition impacts rates, this rule implicates ratemaking. We disagree. Providing a procedure whereby an electric utility can elect to compete is, at best, incidental to prescribing rates and charges and is not a necessary step in ratemaking. *US West I,* 197 Ariz. at 25, ¶ 35, 3 P.3d at 945.

¶ 89 R14–2–1613 requires Affected Utilities, distribution providers and ESPs to provide reports to the Commission regarding, among other things, kilowatt and kilowatt-hours sales to consumers, revenues from sales by customer classes, breakdown of retail customers by customer class, revenue by each type of competitive and noncompetitive services, and the value of all assets used to serve Arizona customers and accumulated depreciation. The Commission can use this type of information to monitor the financial status of Affected Utilities and ESPs. Whether the entities are economically stable necessarily impacts rates. *Woods,* 171 Ariz. at 295, 830 P.2d at 816. Additionally, this information enables the Commission to protect consumers from abuse and overreaching. *Id.*

at 295–96, 830 P.2d at 816–17. For these reasons, R14–2–1610 is reasonably related to ratemaking and therefore not subject to attorney general review and certification. The superior court erred by ruling otherwise.

¶ 90 R14–2–1615(B) prohibits Affected Utilities from providing competitive services. R14–2–1616 mandates that Affected Utilities that plan to offer competitive services through an affiliate file a code of conduct setting forth procedures in place to prevent cross-subsidization between the entities. As previously explained, *see supra* ¶¶ 65, 71, we defer to the Commission's position that these rules are reasonably necessary to ratemaking because they allow the Commission to ensure that competition is fair, which will ultimately impact the rates paid by customers. Consequently, these rules are not subject to attorney general review and certification, and the superior court erred by ruling otherwise.

¶ 91 In summary, we hold that the superior court erred by ruling that A.A.C. R14–2–1602, –1610, –1613, –1615(B), and –1616 were not enacted within the Commission's plenary authority and therefore were subject to attorney general review and certification pursuant to A.R.S. § 41–1044(B). We affirm the court's ruling that the other challenged rules were promulgated outside the Commission's plenary power and were therefore subject to attorney general review and certification.

## III. Other issues on cross-appeal

### A. Discrimination

¶ 92 The Cooperatives argue that the superior court erred by entering judgment against them on their claims that the decisions promulgating the Rules and issuing CC & Ns to the ESPs violate anti-discrimination provisions set forth in the Arizona Constitution and A.R.S. § 40–334 (1996). They claim that the decisions unlawfully discriminate in two ways, which we address in turn.

¶ 93 First, the Cooperatives contend that the Commission decisions unlawfully differentiate among public service corporations by

18. *See* A.A.C. R14–2–1603 (issuance of CC & Ns), –1605 (requirement for CC & Ns for competitive services), –1609 (transmission and distribution access), –1612 (service quality, consumer protection, safety, and billing requirements), – 1613 (administrative requirements), –1617 (disclosure of information to consumers).

allowing ESPs to negotiate rates within multiple service territories, while Affected Utilities are confined to defined territories and must charge rates prescribed by the Commission. According to the Cooperatives, the Commission's constitutional ratemaking authority does not permit the creation of this "caste system" of public service corporations.[19] Without explanation, the superior court ruled that this issue was not ripe for review.

¶ 94 An administrative decision is ripe for judicial review when the agency has formalized the decision and the challenging party has been affected by it in a concrete manner. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The courts determine ripeness by evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507.

¶ 95 Employing this analytical framework, we agree with the Cooperatives that this issue is ripe for review. The challenged decisions are final, and the Cooperatives' assertion that the Commission lacked authority to differentiate among public service corporations is not dependent on future events. *See id.* Additionally, the impact of the decisions on the Cooperatives is sufficiently direct and immediate to make judicial review appropriate because they must now compete in their service territories under this alleged "caste system." *See id.* at 152, 87 S.Ct. 1507. For this reason, the superior court erred by failing to review the Cooperatives' contention, which we now consider.

¶ 96 To support its challenge to the Commission's authority to differentiate among public service corporations, the Cooperatives rely on the interplay between Article 15, Section 2 and Article 15, Section 3, of the Arizona Constitution. The former provision defines "public service corporations" as all non-municipal corporations that engage in various essential community services, such as the provision of electricity. Ariz. Const. art. 15, § 2. Section 3 then bestows on the Commission authority to prescribe "just and reasonable classifications to be used . . . by public service corporations." According to the Cooperatives, because Section 2 contemplates one class of public service corporations, and Section 3 only authorizes the Commission to prescribe classifications of customers and services to be used by such corporations, the constitutional framers did not authorize the Commission to create classes of public service corporations.

¶ 97 Nothing in the language of Article 15, Sections 2 and 3 limits the Commission's authority to differentiate among public service corporations in. the manner in which they serve the public interest. Section 2 simply defines "public service corporations" for use in other constitutional provisions. Section 3 both promotes competitive economic forces and empowers the Commission to protect consumers by ensuring that public service corporations charge fair rates for their services. *See Woods*, 171 Ariz. at 291–92, 830 P.2d at 812–13. Thus, as long as the Commission's differentiation among public service corporations is reasonably related to the Commission's ratemaking authority, *id.* at 294, 830 P.2d at 815, Sections 2 and 3 do not prohibit such distinctions. For this reason, we reject the Cooperatives' argument and conclude that the superior court properly entered judgment against them on this issue.

¶ 98 The Cooperatives next argue that the decisions permit the ESPs to charge different rates to similarly situated customers in violation of Article 15, Section 12, of the Arizona Constitution and A.R.S. § 40–334. Article 15, Section 12 prohibits public service corporations from discriminating in the rates charged "for rendering a like and contemporaneous service." Similarly, § 40–334 forbids such corporations from charging preferential rates or establishing any "unreasonable difference as to rates." *See also*

---

**19.** The Cooperatives' argument is closely linked to their unsuccessful claim to the superior court that the differentiation among public service corporations violates the equal protection provisions of the state and federal constitutions. The Cooperatives do not challenge the court's ruling on this issue, and we therefore do not address the equal protection claim further.

*Town of Wickenburg v. Sabin,* 68 Ariz. 75, 77–78, 200 P.2d 342, 343–44 (1948) (holding public service corporation obligated to furnish service to each patron at same price charged to other patrons for substantially similar service).

¶ 99 The superior court ruled that the Cooperatives' challenge under these provisions was speculative and not ripe for review, and we agree. As the court recognized, the ESPs remain bound by Article 15, Section 12 and A.R.S. § 40–334 in negotiating and establishing rates with customers. Additionally, nothing in the Rules or CC & N decisions is facially inconsistent with these provisions. Thus, although the Commission decisions are final, whether the ESPs violate Article 15, Section 12 or § 40–334 when competing for services depends on future events. Until an ESP charges a rate that allegedly violates these provisions, allowing the court to apply legal principles to a concrete set of facts, the issue is not ready for review. *See Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507. Additionally, unless such pricing abuse occurs, the Cooperatives will not suffer any direct and immediate impact from a competitive scheme that permits ESPs to negotiate rates with consumers. *See id.* at 152, 87 S.Ct. 1507. For these reasons, this discrimination claim is not ripe for review, and the superior court properly entered judgment against the Cooperatives on this issue.

### B. Contract impairment

¶ 100 The Cooperatives next argue that the superior court erred by ruling against them on their claims that the Commission impaired the Cooperatives' contract rights in violation of both Article I, Section 10, of the United States Constitution and Article 2, Section 25, of the Arizona Constitution. These "contract clauses" prohibit the State from passing any law that impairs the obligation of a contract.[20] According to the Cooperatives, the Commission's decisions implementing competition in the electric generation market violate these constitutional provisions by impairing obligations under two types of contracts

binding the Cooperatives. After describing the general principles applicable to contract clause claims, we address the Cooperatives' contentions.

¶ 101 Although the language in the contract clauses of the federal and state constitutions is seemingly absolute, the State can impair contract obligations in the exercise of its inherent police power to safeguard vital public interests. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); *see McClead v. Pima County,* 174 Ariz. 348, 359, 849 P.2d 1378, 1389 (App. 1992). To determine whether the State has properly exercised this police power, our courts employ a three-part inquiry. A court initially determines whether the law substantially impairs a contractual relationship. *Energy Reserves,* 459 U.S. at 411, 103 S.Ct. 697; *McClead,* 174 Ariz. at 359, 849 P.2d at 1389. If so, the State must identify a significant and legitimate public purpose to justify the law. *Energy Reserves,* 459 U.S. at 411–12, 103 S.Ct. 697; *McClead,* 174 Ariz. at 359, 849 P.2d at 1389. Finally, if such a purpose exists, the State must show that the adjustment of the parties' contractual obligations is reasonable and appropriate to the public purpose justifying adoption of the law. *Energy Reserves,* 459 U.S. at 412, 103 S.Ct. 697; *McClead,* 174 Ariz. at 359, 849 P.2d at 1389.

### 1. Contract between the Cooperatives and the State

¶ 102 The Cooperatives first argue that by allowing the ESPs to compete in the Cooperatives' service territories, the Commission impaired the Cooperatives' contracts with the State, represented by CC & Ns, to exclusively provide electric power services as regulated monopolies. The Commission and AECC respond, and the superior court agreed, that the CC & Ns are not "contracts" and the Commission's decisions could not, therefore, impair any contractual obligations

20. Article I, Section 10, of the United States Constitution provides, in pertinent part, that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts...." Similarly, Article 2, Section 25, of the Arizona Constitution states that "[n]o ... law impairing the obligation of a contract, shall ever be enacted."

existing between the Cooperatives and the State.

¶ 103 According to the Cooperatives, Article 15, Section 7, of our constitution extended an offer to the Cooperatives to provide electric service, which they accepted by expending substantial resources to do so, thereby forming a contract. That provision states, in pertinent part, that "public service corporation[s] organized or authorized . . . to do any transportation or transmission business within the State shall have the right to construct and operate lines connecting any points within the State, and to connect at the State boundaries with like lines." Ariz. Const. art. 15, § 7. The Cooperatives further contend that by authorizing the Commission to issue CC & Ns, *see* A.R.S. §§ 40–281, –282, the legislature intended the contracts formed under Article 15, Section 7 to bestow monopoly rights on the Cooperatives to provide services within their territories. *See Mountain States Tel. and Tel. Co. v. Arizona Corp. Comm'n,* 132 Ariz. 109, 114, 644 P.2d 263, 268 (1982) ("The concept of the regulated monopoly arose from the legislature in granting to the Commission the authority to issue certificates of convenience and necessity to public service corporations.").

¶ 104 The Commission and AECC assert that we should reject the Cooperatives' contention in view of our decision in *US West I.* In that case, this court rejected a contention urged by U.S. West that the Commission could not introduce competition in the telecommunications market without materially breaching U.S. West's regulatory contract with the State. 197 Ariz. at 21–22, ¶¶ 17–18, 3 P.3d at 941–42. Relying in part on authority now cited by the Cooperatives,[21] U.S. West argued that a contract had been formed when it agreed to provide telephone service at regulated rates in exchange for the State's promise of protection from competition. *Id.* at 21, ¶ 17, 3 P.3d at 941.

¶ 105 The court rejected U.S. West's assertion, holding that the nature of U.S. West's relationship with the State is not contractual. *Id.* at 21–22, ¶ 18, 3 P.3d at 941–42. We distinguished the cases relied upon by U.S. West by explaining they spoke "descriptively or metaphorically; none [held] that there [was] an actual contract, for breach of which the law of contracts gives a remedy." *Id.* Courts presume that a legislature does not intend to create private contract rights by enacting a statute. *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). No such intent appeared from the constitution or laws underlying issuance of U.S. West's CC & N, and U.S. West had not otherwise proved the existence of a contract. *US West I,* 197 Ariz. at 22, ¶¶ 19–24, 3 P.3d at 942. We held that U.S. West had failed to state a claim for breach of contract. *Id.; see also Proksa v. Arizona State Sch. for the Deaf and the Blind,* 205 Ariz. 627, 630, ¶ 15, 74 P.3d 939, 942 (2003) (citing *US West I* with approval).

¶ 106 The Cooperatives contend that *US West I* is distinguishable because the case concerned a breach of contract claim rather than an impairment of contract claim. We agree with the Commission and AECC, however, that the distinction is not meaningful. Both claims depend on the existence of a contract. *US West I* expressly rejects the notion that a contract is formed by issuance of a CC & N. The court's reasoning in that case, albeit in the context of a breach of contract claim, is equally applicable to the Cooperatives' contention that their CC & Ns represent contracts with the State for the Cooperatives to exclusively sell electric services within their territories.

¶ 107 The Cooperatives also urge us to ignore the holding in *US West I* because the court in that case did not consider the additional contention that Article 15, Section 7, of

21. *See James P. Paul Water Co. v. Arizona Corp. Comm'n,* 137 Ariz. 426, 429, 671 P.2d 404, 407 (1983) (stating public service corporation receives monopoly in return for providing adequate service at reasonable rates); *Application of Trico Elec. Coop., Inc.,* 92 Ariz. 373, 380–81, 377 P.2d 309, 315 (1962) (holding State, by issuing CC & N, "in effect contracts" that if public service corporations makes adequate investment and renders competent service, it will have monopoly). *City of Tucson v. Polar Water Co.,* 76 Ariz. 404, 409, 265 P.2d 773, 775–76 (1954), cited by the Cooperatives but not discussed in *US West I,* also holds that the State "contracts in effect" by issuing a CC & N.

the Arizona Constitution separately grants private contract rights to public service corporations. The Cooperatives rely primarily on *Russell v. Sebastian,* 233 U.S. 195, 34 S.Ct. 517, 58 L.Ed. 912 (1914), to support this argument. In *Russell,* the Supreme Court addressed the effect of a California constitutional provision that granted private parties the "privilege of using the public streets" to lay pipes necessary to supply light and water to municipalities that lacked public works for those purposes. *Id.* at 198, 34 S.Ct. 517. The Court held that the provision was an offer that, when accepted by establishment of a private plant devoted to public service, "constituted a contract, and vested in the accepting individual or corporation a property right," which was protected from impairment by the contract clause in the federal constitution. *Id.* at 204, 210, 34 S.Ct. 517.

¶ 108 Relying on *Russell,* our supreme court has similarly held that Salt River Project ("SRP"), an agricultural improvement district not subject to Commission regulation, which commits resources to serve as a public utility selling electricity, possesses a "property right" protected from impairment by the contract clause of the state constitution. *City of Mesa v. Salt River Project Agric. Improvement & Power Dist.,* 92 Ariz. 91, 99–100, 373 P.2d 722, 728 (1962). Consequently, the court held that a municipality could not oust SRP from doing business within that municipality without just compensation. *Id.* at 100, 373 P.2d at 728.

¶ 109 The Cooperatives contend that like the California constitutional provision at issue in *Russell,* Article 15, Section 7, of the Arizona Constitution constitutes an offer by the State for public service corporations to engage in the business of providing electricity. Following the reasoning in *Russell* and *City of Mesa,* the Cooperatives argue that once they accepted the grant of authority under Article 15, Section 7 by making substantial investments to provide electric service, a contract was formed that enjoys protection under the contract clauses of the state and federal constitutions.

¶ 110 The Commission does not address the impact of *Russell* or *City of Mesa.* AECC argues, however, that these cases establish, at most, that public service corporations can have contract rights in *transmission* and *distribution* of electricity, not *generation* of electricity. Because competition is limited to the electric generation market, AECC contends that any contractual rights in distribution and transmission possessed by the Cooperatives are not substantially impaired.

¶ 111 Even assuming that *Russell* is distinguishable due to differences between the Arizona and California constitutions, we are bound by our supreme court's decision in *City of Mesa* and have "no authority to overrule, modify, or disregard" that decision. *State v. Miranda,* 198 Ariz. 426, 429, ¶ 13, 10 P.3d 1213, 1216 (App.2000), *aff'd,* 200 Ariz. 67, 22 P.3d 506 (2001). For this reason, we decide that Article 15, Section 7, of the constitution confers property rights on public service corporations that undertake the task of selling electricity and these rights are protected by the contract clause of the Arizona Constitution. *City of Mesa,* 92 Ariz. at 99–100, 373 P.2d at 728.

¶ 112 We agree with AECC, however, that the rights conferred by Article 15, Section 7 protect only a public service corporation's right to construct and operate lines to transmit and distribute electricity.[22] Ariz. Const. art. 15, § 7; *see also* A.R.S. § 40–283 (2001) (implementing Article 15, Section 7 outside the CC & N process). The provision does not confer any right to generate the electricity that is ultimately transmitted and sold for public use. Moreover, the provision does not confer any right to exclusively sell electricity. *See Russell,* 233 U.S. at 202, 34 S.Ct. 517 (deciding California constitutional provision does not permit "assertion of an exclusive franchise" and others may compete); *City of Mesa,* 92 Ariz. at 100, 373 P.2d at 729 (concluding municipality could "freely compete" with SRP to provide electricity but for legislative prohibition); *see also Mountain States,* 132 Ariz. at 114, 644 P.2d at 268 (describing regulated monopoly as creation of legislature

---

**22.** Although Article 15, Section 7 also addresses public service corporations that perform transportation services, we confine our discussion to the impact of that provision on corporations that provide electric services.

rather than constitution). For these reasons, and because the Cooperatives have not suggested how the introduction of competition in the generation market impairs their non-exclusive rights to transmit and distribute electricity, the superior court correctly entered judgment against the Cooperatives on this claim.

### 2. Contracts between Cooperatives and AEPCO

¶ 113 The Cooperatives next argue that the introduction of competition in the generation market will impair obligations existing under all-requirements wholesale power contracts between AEPCO and the distribution cooperatives. We are unable to determine whether the superior court rejected this claim on its merits or ruled that the claim was not ripe for review. Regardless, the court properly entered judgment against the Cooperatives on this issue.

¶ 114 The all-requirements contracts require the distribution cooperatives to purchase all electricity needed from AEPCO, the generation and transmission cooperative, and further obligate AEPCO to supply all needed electricity to the distribution cooperatives. The contracts do not require a particular volume of sales. Nevertheless, the Cooperatives argue that the Commission's decisions impair the obligations of these contracts because competition may decrease the distribution cooperatives' power needs, thereby diminishing the income stream needed by AEPCO to continue supplying power in rural areas.

¶ 115 The contractual "obligation" that is the subject of constitutional protection consists of the law or duty binding the parties to perform their agreement. *Picture Rocks Fire Dist. v. Pima County*, 152 Ariz. 442, 444, 733 P.2d 639, 641 (App.1986) (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934)). Such an obligation is impaired "when the legislative enactment changes the obligation in favor of one party against another, either by enlarging or reducing the obligation." *Id.* at 444–45, 733 P.2d at 641–42.

¶ 116 Although the introduction of competition may affect the income stream to AEPCO, the parties' obligations under the all-requirements contracts are not changed "in favor of one party against another." *Id.* The distribution cooperatives are still required to purchase all their power from AEPCO, which must supply this power. For this reason, competition in the generation market does not impair any obligations under the contracts, and the superior court properly entered judgment against the Cooperatives on this claim. *Cf. Earthworks Contracting, Ltd. v. Mendel–Allison Constr. of Cal., Inc.*, 167 Ariz. 102, 108, 804 P.2d 831, 837 (App.1990) (holding that application of licensing statute effective after unlicensed subcontractor entered construction agreement with contractor would impair obligations under the contract because contractor would be relieved of its obligation to pay for subcontractor's services).

¶ 117 The all-requirements contracts also serve as partial security for loans granted to the Cooperatives by the Rural Utilities Service ("RUS"), an agency of the United States Department of Agriculture, which makes and guarantees loans to electric distribution, transmission, and generation facilities. *See* 7 C.F.R. § 1710.100 (2003). RUS requires its borrowers to enter such contracts to ensure that the borrowers will earn sufficient revenue to meet their costs. *See Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 988 F.2d 1480, 1485 (7th Cir.1993). The Cooperatives state in a heading that competition also impairs contracts with RUS. Because the Cooperatives do not develop this argument further, however, they have waived it. *Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996).

### C. Taking property rights

¶ 118 The Cooperatives next argue that the superior court erred by entering judgment against them on their claim that the stranded-costs provisions of the Rules violate Article 2, Section 17, of the Arizona Constitution. The superior court rejected this claim without explanation.

¶ 119 Prior to promulgation of the Rules, Affected Utilities invested monies to supply electricity to the public. Traditionally, the utilities recovered these costs through regulated rates charged to customers. Because competitive pricing may reduce income to the Affected Utilities, thereby hindering their ability to recover these costs, the Rules provide a recovery procedure. Specifically, R14–2–1607 sets forth a mechanism that allows Affected Utilities to recover such "stranded costs" through the imposition of an additional rate or charge on consumers who choose competitive services. Competition will not commence in an Affected Utility's service territory until completion of its stranded-costs case. A.A.C. R14–2–1604.

¶ 120 Article 2, Section 17 states, in relevant part, that "[n]o private property shall be taken or damaged for public or private use without just compensation having first been made ... which compensation shall be ascertained by a jury." The Cooperatives argue that the stranded-costs procedure improperly bypasses the constitutional mandate that a jury determine just compensation for Affected Utilities as a result of competition in the generation market.

¶ 121 We agree with AECC that the recovery of stranded costs is part of ratemaking rather than compensation for a taking. As previously explained, the Commission is charged with prescribing rates that are fair to all concerned, including public service corporations. *Arizona Cmty. Action Ass'n,* 123 Ariz. at 231, 599 P.2d at 187. Imposing additional rates on consumers who elect competitive services in order for Affected Utilities to recover stranded costs furthers that purpose. Nothing in Article 2, Section 17 forecloses this mechanism. Similarly, nothing in the Rules prevents Affected Utilities from seeking compensation for a taking pursuant to Article 2, Section 17. For these reasons, the superior court properly entered judgment against the Cooperatives on this claim.

### D. Free speech violation

¶ 122 The Cooperatives intend to offer competitive services outside their service territories through Sierra Southwest Cooperative Services, Inc., a competitive electric generation affiliate of AEPCO, and plan to jointly market these services. In the code of conduct required to be submitted and approved by the Commission, the Cooperatives must adopt "appropriate guidelines" to govern the use of their names or logos by Sierra. A.A.C. R14–2–1616(B)(4). Additionally, the Cooperatives must adopt policies to "eliminate joint advertising, joint marketing, or joint sales" between them and Sierra. A.A.C. R14–2–1616(B)(6).

¶ 123 The Cooperatives argue that the superior court erred by entering judgment against them on their claim that A.A.C. R14–2–1616(B)(4) and (6) violate their free commercial speech rights under the First Amendment to the United States Constitution and Article 2, Section 6, of the Arizona Constitution. The superior court denied the Cooperatives' motion without explanation.

¶ 124 To determine whether a restriction on commercial speech is constitutional, we apply a four-part test. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[23] First, we determine whether the speech concerns unlawful activity or is misleading. *Id.* If so, the speech does not enjoy constitutional protection. *Id.* If the speech is neither unlawful nor misleading, the restriction is constitutional only if the asserted governmental interest is substantial, the regulation directly advances that interest, and the regulation is not more extensive than necessary to serve that interest. *Id.* The burden of identifying a substantial interest and justifying the restriction rests with the government. *Greater New Orleans Broad. Ass'n, Inc. v. United States,* 527 U.S. 173, 183, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).

¶ 125 The Commission asserts that joint marketing efforts between Affected Utilities

---

**23.** Although the Arizona Constitution provides greater speech rights than the United States Constitution, *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 354, 773 P.2d 455, 459 (1989), no party suggests that we apply a different test to decide whether the Cooperatives' rights to free commercial speech are impinged under the state constitution.

and their competitive affiliates are not constitutionally protected speech because consumers could be misled to believe that the entities are conducting joint enterprises. We agree with AECC, however, that an advertisement indicating that companies are affiliates would be truthful and not misleading. *See United States v. Edge Broad. Co.,* 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) (concluding first prong of *Central Hudson* satisfied because Court assumes radio station will air nonmisleading advertisements about legal activity). Such commercial speech is therefore afforded constitutional protection. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. We therefore consider the remaining prongs set forth in *Central Hudson.*

¶ 126 The Commission asserts that it has a substantial interest in preventing cross-subsidization of affiliates by Affected Utilities, which would give the affiliates a competitive edge and negatively affect rates. The Cooperatives do not contest this assertion, and we agree with it. The State has a substantial interest in ensuring that the fledgling competitive market is free of any unfair advantage in favor of competitors that enjoy an affiliate relationship with an incumbent utility.

¶ 127 The Cooperatives contest that the Commission satisfied its burden to demonstrate that the challenged restriction directly advances its interest. They argue that because the Commission failed to conduct an evidentiary hearing, its conclusion that joint marketing would harm competition is the result of conjecture and speculation. We disagree. First, as the Commission and AECC point out, if joint marketing did not provide some advantage, the Cooperatives would have no reason to challenge the restriction. *See id.* at 569, 100 S.Ct. 2343 (noting utility would not contest ban on advertising in interest of energy conservation if it did not believe advertising would increase sales and consumption). Second, the Commission could employ common sense to conclude that a competitive affiliate would enjoy an advantage if joint marketing efforts enabled consumers to connect the affiliate with an incumbent utility.

¶ 128 The Cooperatives finally argue that the restriction is "far more extensive than necessary to permit electric competition," but offer no further explanation for this contention. Assuming the Cooperatives contend that the restriction fails the fourth prong of *Central Hudson* because the Commission did not conduct an evidentiary hearing, we reject this contention. The Commission will approve or disapprove the Cooperatives' codes of conduct only after first conducting a hearing. A.A.C. R14–2–1616(A).

¶ 129 For all these reasons, the superior court correctly denied the Cooperatives summary judgment on their claim that R14–2–1616(B)(4) and (6) violate their rights to free commercial speech under the federal and state constitutions.

## IV. Relief granted by court

¶ 130 Because the Commission failed to include a fair-value provision within the Rules, and certain rules required attorney general certification pursuant to the APA, the superior court vacated all Commission decisions approving the Rules and issuing CC & Ns to the ESPs. The Commission, AECC, and RUCO argue that the court erred by refusing to simply sever the invalid portions of the decisions and then remand to the Commission to both make the required fair-value determinations and submit the contested rules to the attorney general for review and certification. Relying on A.R.S. § 40–254, the Cooperatives counter that the court was not authorized to grant this relief.

¶ 131 Section 40–254 provides in pertinent part as follows:

A. [A]ny party in interest ..., being dissatisfied with an order or decision of the commission, *may ... commence an action* in the superior court ... against the commission as defendant, *to vacate, set aside, affirm in part, reverse in part or remand with instructions to the commission* such order or decision....

. . . .

C. The trial shall conform ... to other trials in civil actions. *Judgment shall be given affirming, modifying or setting aside the original or amended order.*

(emphasis added). Thus, under subsection A, a party aggrieved by a Commission decision may ask the superior court to affirm in part, reverse in part, and/or remand. Yet, under the plain language of subsection C, the court cannot grant this relief. Our resolution of the parties' dispute turns on interpreting § 40–254 so as to effectuate the legislature's intention regarding the scope of the court's authority to grant relief. *See Mail Boxes v. Indus. Comm'n of Arizona*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995) (noting primary goal in construing statute is to fulfill intent of legislature).

¶ 132 Before 1985, § 40–254(A) provided that a party dissatisfied with a Commission decision could commence an action "to vacate and set aside" the decision. A.R.S. § 40–254, Historical and Statutory Notes. Section 40–254(C) was the same as it reads today. Thus, before 1985, the superior court indisputably lacked authority to grant any relief under the statute other than affirming, modifying or setting aside a Commission decision. *See Sun City Water Co. v. Arizona Corp. Comm'n*, 113 Ariz. 464, 466, 556 P.2d 1126, 1128 (1976) (concluding court lacked authority to affirm Commission decision in part and remand another portion); *Arizona Corp. Comm'n v. Fred Harvey Transp. Co.*, 95 Ariz. 185, 190, 388 P.2d 236, 239 (1964) (holding superior court lacked authority to remand to Commission).

¶ 133 In 1985, the legislature amended § 40–254(A) to add that a party dissatisfied with a Commission decision can also request the superior court to affirm in part, reverse in part, or remand with instructions. A.R.S. § 40–254, Historical and Statutory Notes. The legislature did not similarly amend subsection C. The Commission, RUCO, and AECC argue that the amendment broadened the court's authority to grant relief. The Cooperatives contend that because the legislature did not amend subsection C, the court is only authorized to affirm in part, reverse in part, and remand if the complaining party asks for this relief.

¶ 134 The legislative history for the provision does not reflect the reason for the amendment. However, we presume the legislature intended to change the existing law by amending § 40–254(A). *State v. Garza Rodriguez*, 164 Ariz. 107, 111, 791 P.2d 633, 637 (1990). We further presume the legislature did not intend to perform a futile act by enacting an inoperable statutory provision. *Patterson v. Maricopa County Sheriff's Office*, 177 Ariz. 153, 156, 865 P.2d 814, 817 (App.1993). Additionally, we will interpret § 40–254 to give it a fair and sensible meaning, *City of Phoenix v. Superior Court*, 139 Ariz. 175, 178, 677 P.2d 1283, 1286 (1984), rather than a hypertechnical construction that frustrates legislative intent. *State v. Cornish*, 192 Ariz. 533, 537, ¶ 16, 968 P.2d 606, 610 (App.1998).

¶ 135 Applying these principles, we conclude that the legislature intended the 1985 amendment to authorize the superior court to affirm a Commission decision in part, reverse it in part, or remand. The contrary interpretation would mean that a party dissatisfied with a Commission decision could ask for this relief, but the court could not grant it, making the 1985 amendment ineffective. We reject the Cooperatives' attempt to harmonize subsections A and C by reading them to mean that the court is only authorized to partially affirm, reverse, and remand if requested to do so by the complaining party. Nothing in the language of § 40–254 supports a view that subsection C enlarges the court's authority only if specifically requested under subsection A.

¶ 136 For these reasons, we conclude that § 40–254 authorizes the superior court to affirm a Commission decision in part, reverse it in part, and/or remand to the Commission, whether or not the complaining party requests this relief. *Cf.* Ariz. R. Civ. P. 54(d) ("[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."). We reach this result while recognizing that the Arizona Supreme Court in a post-amendment case reiterated that courts had authority only to affirm, modify, or set aside Commission decisions. *Elec. Dist. No. 2 v. Arizona Corp. Comm'n*, 155 Ariz. 252, 259, 745 P.2d 1383, 1390 (1987). In that case, however, the court did not discuss the 1985 amendment, and the type of remedy was not

at issue because the court affirmed the Commission's decision. *Id.; but cf. US West I,* 197 Ariz. at 26, ¶ 40, 3 P.3d at 946 (directing remand to Commission as remedy). Thus, the supreme court did not determine the effect of the 1985 amendment, and we are therefore not bound by its description of relief available under § 40–254. *See State v. Rosengren,* 199 Ariz. 112, 120, ¶ 26, 14 P.3d 303, 311 (App.2000) ("This court, of course, may not disregard or deviate from controlling decisions of our supreme court."). Having determined that the superior court possessed authority to affirm the Commission decisions in part, reverse them, and/or remand to the Commission for further proceedings, we next decide whether the court erred by failing to do so.

¶ 137 As previously explained, *see supra* ¶¶ 47–52, the court incorrectly declared the entirety of the Rules unconstitutional because it failed to require the Commission to determine and consider the fair value of property owned by ESPs in Arizona. Instead, only R14–2–1611(A) violates Article 15, Section 14, of the Arizona Constitution. Consequently, the court erred by vacating all decisions approving the Rules and their predecessor versions on the basis of the constitutional violation rather than simply reversing the portions of the decisions approving R14–2–1611(A). *Randolph,* 195 Ariz. at 427, ¶ 13, 989 P.2d at 755. Moreover, as previously explained, *see supra* ¶¶ 57–69, because the Commission lacked constitutional or statutory authority to promulgate R14–2–1609(C)–(J) and –1615(A), (C), the court should have reversed these portions of the Rules decisions enacting these provisions.

¶ 138 AECC similarly argues that the court erred by vacating all Commission decisions approving the Rules and predecessor versions because the Commission failed to submit some provisions to the attorney general for review and certification under the APA. According to AECC, the court should have reversed only those portions of the decisions approving the Rules provisions subject to the APA, remanded to the Commission with instructions to submit those provisions for attorney general review, and affirmed the remainder. The Cooperatives assert that be-

cause these provisions were invalid, nothing remained to remand.

¶ 139 The Cooperatives cite *Carondelet Health Servs., Inc. v. Arizona Health Care Cost Containment Sys. Admin.,* 182 Ariz. 221, 895 P.2d 133 (App.1994), and *Cochise County v. Arizona Health Care Cost Containment Sys.,* 170 Ariz. 443, 825 P.2d 968 (App.1991), to support their contention. But neither case addressed whether an agency decision adopting rules could be reversed and remanded for compliance with the APA. Rather, each case voided *actions* taken pursuant to invalid rules. *Carondelet,* 182 Ariz. at 228, 895 P.2d at 140 (holding applications of invalid rule promulgated by state health care system to establish methodology for calculating hospital reimbursement rates void); *Cochise County,* 170 Ariz. at 445, 825 P.2d at 970 (directing judgment against state health care system for refusal of coverage based on invalid administrative rule).

¶ 140 In *US West I,* after holding that the Commission had erroneously failed to seek attorney general certification for certain rules, we directed the superior court to remand to the Commission with instructions to submit the invalid rules to the attorney general for the review. 197 Ariz. at 26, ¶ 40, 3 P.3d at 946. Likewise, we are persuaded that remand to the Commission with instructions to submit the invalid rules to the attorney general is more appropriate than vacating the entirety of the decisions approving the Rules. Attorney general review is the last step in rule promulgation. No reason appears why the Commission must repeat the process of crafting rules rather than simply allowing it to now submit the invalid provisions to the attorney general for the review required under the APA.

¶ 141 Finally, AECC argues that the court erred by vacating the CC & N decisions in their entirety rather than remanding to the Commission to make and use the required fair-value determinations before issuing rate tariffs. We disagree. AECC fails to consider that the Commission decisions issuing the CC & Ns were made pursuant to Rules provisions that were invalid due to lack of attorney general certification. *See supra* ¶ 86. Therefore, pursuant to the authority

urged by the Cooperatives, as Commission actions taken pursuant to invalid rules, the CC & N decisions are void, and the superior court correctly vacated them in their entirety. A.R.S. § 41–1030 ("An agency shall not base a licensing decision in whole or in part on a licensing requirement or condition that is not specifically authorized by statute, rule or state tribal gaming compact."); *Carondelet,* 182 Ariz. at 228, 895 P.2d at 140; *Cochise County,* 170 Ariz. at 445, 825 P.2d at 970.

## V. Attorneys' fees in the superior court

¶ 142 The superior court ruled that the Cooperatives were the prevailing parties and therefore awarded them attorneys' fees pursuant to A.R.S. § 12–348 (2003).[24] The Commission appeals this decision. The court declined to exercise its discretion to award fees at a rate that exceeds the statutorily prescribed maximum rate of $75 per hour. The Cooperatives cross-appeal this ruling.

### A. Cooperatives' entitlement to fees

█ ¶ 143 The Commission first argues that the Cooperatives did not prevail "on the merits" of their challenges to the Rules decisions, as required to award fees under A.R.S. § 12–348(A)(2). In relevant part, that statute mandates an award of attorneys' fees to a non-governmental party who "prevails by an adjudication on the merits" in a court proceeding to review an agency decision. By contrast, if a party prevails only on procedural grounds, § 12–348(A)(2) does not authorize a fee award. *Columbia Parcar Corp. v. Arizona Dep't of Transp.,* 193 Ariz. 181, 183, ¶ 14, 971 P.2d 1042, 1044 (App.1999).

¶ 144 The Commission contends that if we agree that the Rules do not violate Article 15, Section 14, of the Arizona Constitution, we must conclude that the Cooperatives succeeded only on procedural grounds when the superior court ruled that some of the Rules required attorney general review and certification. In light of our holding that A.A.C. R14–2–1611(A) violates Article 15, Sections 3 and 14, and that the Commission lacked authority to promulgate other rules, the premise for the Commission's argument does not

exist. Nevertheless, we reject the Commission's position. Although attorney general review and certification is a procedural requirement, whether the Commission was required to use that procedure was the substance of the Cooperatives' claim presented for judicial review. Because the superior court adjudicated the merits of that claim, the Cooperatives were entitled to an award of fees pursuant to § 12–348(A)(2).

¶ 145 The Commission next argues that the court erred by awarding fees for the Cooperatives' successful adjudication of their claims concerning the CC & N decisions. Section 12–348(H)(1) precludes a fee award for any "action arising from a proceeding . . . in which the role of this state . . . was . . . to establish or fix a rate." The Commission asserts that the CC & N decisions stemmed from proceedings to establish competitive rates, and § 12–348(H)(1) therefore applied to preclude the award. We agree.

¶ 146 In the CC & N decisions, the Commission approved tariffs establishing a range of rates within which the ESPs could charge customers under the Rules. In approving the tariffs, the Commission considered the opinions of various parties as to the appropriateness of the proposed range of rates, the benefits of flexible pricing, the impracticality of basing rates on fair value, and the reasonableness of the rates adopted.

¶ 147 The Cooperatives assert that § 12–348(H)(1) does not apply to the CC & N decisions because the Commission's primary role was not to establish rates, and it did not undertake any fair value analysis for rate setting purposes. Although we agree that the Commission did not set rates in accordance with its constitutional obligations to find fair value, one of its roles in the CC & N proceedings was to establish rates. Additionally, the Cooperatives challenged the CC & N decisions, in substantial part, for the Commission's failure to properly set rates. For these reasons, § 12–348(H)(1) applies, and the superior court erred by awarding fees incurred by the Cooperatives solely in connection with their challenges to the CC &

---

24. The court awarded fees to AEPCO, Duncan, and Graham in the amount of $55,230.90, to

Trico in the amount of $61,624.33, and to Sulphur Springs in the amount of $18,795.67.

N decisions. We therefore reverse that portion of the judgment awarding attorneys' fees to the Cooperatives and remand to the superior court to adjust the award in accordance with our decision.

## B. Hourly rate

¶ 148 The superior court was authorized to award the Cooperatives maximum attorneys' fees of $75 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceeding involved, justifies a higher fee." A.R.S. § 12–348(E)(2). The Cooperatives argue that the court abused its discretion by refusing to award a higher rate in light of the special expertise required to litigate these types of cases and the increase in the cost of living since the legislature enacted § 12–348 in 1981.

¶ 149 We cannot say that the superior court abused its discretion by refusing to adjust the hourly rate. First, although this case required skilled counsel, the Cooperatives made no showing that a limited number of qualified attorneys were available to undertake representation, as required by § 12–348(E)(2). *Arizona Water Co. v. Arizona Dep't. of Water Res.*, 205 Ariz. 532, 540 ¶¶ 38–40, 73 P.3d 1267, 1275 (App.2003).

¶ 150 Second, the increase in the cost of living did not require the court to increase the hourly rate. *See Begley v. Sec'y of Health & Human Servs.*, 966 F.2d 196, 199 (6th Cir.1992) (applying comparative provision in Equal Access to Justice Act, 28 U.S.C. § 2412). The purpose of § 12–348 is to reduce any deterrents for individuals to contest or defend against unreasonable government action by decreasing the "disparity between the resources and expertise of these individuals and their government." A.R.S. § 12–348, Historical and Statutory Notes (Legislative findings). Although the court did not state its reasons for declining to adjust the rate, the record supports a conclusion that a cost-of-living increase in the rate was not necessary to fulfill the purpose of § 12–348. For example, nothing in the record suggests that the Cooperatives suffer a disparity in resources or expertise or that

they will incur significant economic harm by reimbursement of fees at the $75 per hour rate.

¶ 151 For these reasons, we conclude that the superior court did not abuse its discretion by declining to award a greater hourly rate than the statutory maximum.

## VI. Summary of holdings

¶ 152 Even in a competitive market, Article 15, Section 14, of the Arizona Constitution requires the Commission to determine the fair value of Arizona property owned by a public service corporation and consider that determination in establishing just and reasonable rates. The Commission has broad discretion in determining the weight to be given the fair-value factor in any particular case, but may not simply ignore it. The Commission violated Article 15, Section 14 by approving CC & Ns for the ESPs without first determining and considering fair value. *See supra* ¶¶ 18–26.

¶ 153 The Commission is required by Article 15, Section 3, of the Arizona Constitution to set just and reasonable rates for electric services by considering the needs of all whose interests are involved, including public service corporations and the consuming public. Although the Commission may set a range of just and reasonable rates within which public service corporations can compete to provide services, *see supra* ¶¶ 40–44, the Commission cannot carry out its constitutional mandate by allowing competitive market forces to exclusively determine what is "just and reasonable." Commission rule R14–2–1611(A), which deems market rates for competitive services to be just and reasonable, violates Article 15, Section 3. The provision also violates Article 15, Section 14 by establishing a method for setting just and reasonable rates that does not include consideration of the fair value of property owned by ESPs in Arizona. Because R14–2–1611(A) cannot be validly applied under any set of circumstances, it is unconstitutional on its face. *See supra* ¶¶ 27–39. The remaining Commission Rules, however, are not unconstitutional and can remain intact. *See supra* ¶¶ 45–52.

¶ 154 The Commission lacked constitutional or legislative authority to promulgate A.A.C. R14–2–1609(C)–(J), and –1615(A) and (C), and these provisions are therefore invalid. *See supra* ¶¶ 53–69. However, the Commission possessed constitutional authority to promulgate R14–2–1616. *See supra* ¶¶ 70–76. The Commission was required by the APA, A.R.S. § 41–1044(B), to submit R14–2–1603, –1605, –1609, –1612, –1614, and –1617 to the attorney general for review and certification. Because it failed to do so, these provisions are invalid. Because the Commission possessed plenary ratemaking authority to promulgate R14–2–1602, –1610, –1613, –1615(B), and –1616, the Commission was not required to submit these provisions to the attorney general for review and certification. *See supra* ¶¶ 77–91.

¶ 155 Article 15, Sections 2 and 3, of the Arizona Constitution do not limit the Commission's authority to treat public service corporations differently. Thus, the Commission did not exceed its constitutional authority by differentiating between ESPs and Affected Utilities. The Cooperatives' discrimination claim under Article 15, Section 12 and A.R.S. § 40–334 is not ripe for review. *See supra* ¶¶ 92–99.

¶ 156 Article 15, Section 7, of the Arizona Constitution confers property rights on public service corporations that undertake the task of selling electricity, and these rights are protected by the contract clause of the Arizona Constitution. These rights, however, protect only a public service corporation's non-exclusive right to construct and operate lines to transmit and distribute electricity. The introduction of competition in the electric generation market does not impair these rights. Similarly, competition does not impair the all-requirements wholesale power contract existing between distribution cooperatives and AEPCO, a generation and transmission cooperative. *See supra* ¶¶ 102–117.

¶ 157 The stranded-costs provisions of the Rules, R14–2–1607, are part of the Commission's ratemaking function and not compensation for a taking of private property. Thus, the provisions do not improperly supplant the taking mechanism established by Article 2, Section 17, of the Arizona Constitution. *See supra* ¶¶ 118–121.

¶ 158 The provisions of the Rules requiring Affected Utilities to submit codes of conduct that adopt policies to eliminate joint marketing with competitive affiliates do not violate the Cooperatives' free commercial speech rights under the federal and state constitutions. *See supra* ¶¶ 122–129.

¶ 159 Section 40–254, A.R.S., authorizes the superior court to affirm a Commission decision in part, reverse it in part, and/or remand to the Commission, whether or not the complaining party requests this relief. The superior court erred by vacating the Rules decisions in their entirety rather than affirming them in part, reversing in part, and remanding to the Commission to submit some invalid rules to the attorney general for review and certification. *See supra* ¶¶ 130–141.

¶ 160 The Cooperatives are entitled to an award of attorneys' fees in the superior court pursuant to A.R.S. § 12–348 for prevailing on the merits in their challenges to the Rules decisions. However, the Cooperatives are not entitled to an award of attorneys' fees under that provision for successfully challenging the CC & N decisions. The superior court did not abuse its discretion by refusing to award fees at an hourly rate greater than the statutorily prescribed maximum. *See supra* ¶¶ 142–151.

## VII. Attorneys' fees on appeal

¶ 161 The Council alone requests attorneys' fees on appeal pursuant to A.R.S. § 12–348. We conclude that the Council prevailed in this appeal and therefore award it fees and expenses, subject to compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

## CONCLUSION

¶ 162 The superior court erred by vacating the Rules decisions in their entirety. Consequently, we reverse that portion of the judgment. In accordance with A.R.S. § 12–2103(A), which permits us to render the judgment the superior court should have entered, and because no further action is required via remand to that court, we reverse the portions of the Commission decisions promulgating R14–2–1609(C)–(J), –1611(A), and –1615(A), (C). We additionally reverse the portions of the Commission decisions

promulgating R14–2–1603, –1605, –1609(A)–(B), –1612, –1614, –1615(B), and –1617, and remand to the Commission with instructions to submit these rules to the attorney general for review under A.R.S. § 41–1044(B). We affirm the remaining portions of the Rules decisions.

¶ 163 The superior court correctly vacated the CC & N decisions. We therefore affirm that portion of the judgment.

¶ 164 We affirm that portion of the judgment awarding attorneys' fees at the rate of $75 per hour to the Cooperatives for their successful challenges to the Rules decisions. We reverse that portion of the judgment awarding fees expended by the Cooperatives only to challenge the CC & N decisions. We therefore remand to the superior court to adjust the award to eliminate any such fees.

¶ 165 Finally, we award attorneys' fees to the Council for fees and expenses incurred in this appeal subject to its compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

CONCURRING: JOHN C. GEMMILL, Judge, and SUSAN A. EHRLICH, Judge.